1

2

3

4

5

6

7

8       **UNITED STATES DISTRICT COURT**

9       **EASTERN DISTRICT OF CALIFORNIA**

10

11  SEBASTIANA MARTINEZ-SANCHEZ, et ) Case No.: 1:19-cv-01404-DAD-JLT
    al.,                           )
12              Plaintiffs,        ) FINDINGS AND RECOMMENDATIONS
                                   ) GRANTING IN PART PLAINTIFFS' MOTION
13          v.                     ) FOR CLASS CERTIFICATION
                                   )
14  ANTHONY VINEYARDS, INC., et al., ) (Doc. 66)
                                   )
15              Defendants.        )
                                   )
16  _____ )

17          Sebastiana Martinez-Sanchez and Eugenio Cruz seek to represent a class of workers employed

18  by Anthony Vineyards, Inc. and Sycamore Labor, Inc. in California between October 4, 2015 and the

19  present, challenging a number of policies and practices, which resulted in alleged violations of state

20  and federal law and lost wages to Plaintiffs and the class. Plaintiffs seek class certification pursuant to

21  Rule 23 of the Federal Rules of Civil Procedure. (Doc. 66.) On June 30, 2021, Defendants filed its

22  opposition to the motion. (Doc. 70), to which Plaintiffs filed a reply on July 30, 2021 (Doc. 71). The

23  Court granted leave to file a sur-reply on the issue of allowing a new class representative to be named

24  (Doc. 72), which Defendants filed on August 16, 2021 (Doc. 74). Plaintiffs filed a reply to the sur-

25  reply on August 23, 2021. (Doc. 75.)

26          The Court has read and considered the pleadings and supporting documents.  For the reasons

27  set forth below, the Court recommends Plaintiffs' motion for class certification be **GRANTED IN**

28  **PART**.

1

## I.      BACKGROUND

The plaintiffs assert that they and the putative class members worked for the defendants during the four-year period before the action was filed performing field and vineyard work including, weeding, pruning, de-leafing, tipping, harvesting, picking, and packing. (Doc. 6 at 2.) The plaintiffs contend that the defendants failed to pay them for all the hours worked at the minimum or contract rate, failed to provide meal and rest breaks or failed to pay premium wages in lieu of the breaks, failed to reimburse them for needed tools that they purchased for the work and failed to provide correct and timely itemized wage statements, among other claims. (Id.) The plaintiffs claim these acts violate the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") and California law. (Id.)

## II.      PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs contend that this case is suited for class treatment, because the Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) classes revolve around common questions of liability that are subject to common proof. (Doc. 66-1 at 24.) Plaintiffs allege that the overarching common question supporting certification of a Rule 23(b)(2) class is whether Defendants violated Wage Order 14 and Labor Code sections 226 and 1174 by failing to record accurately when each employee's work period begins and ends. (Id.) According to Plaintiffs, the evidence shows that while Defendants maintain records of "shifts"—i.e., the designated beginning and ending time established by the company for its crews—Defendants do not maintain a timekeeping system that allows employees to record the time when they begin and end each work period. (Id.) According to Plaintiffs, evidence from Defendants shows that workers do not uniformly and consistently work the hours that are scheduled by the company, but they are required to stand in line before the start of the shift to sign in for attendance and certain safety and training certifications, and then after the shift ends, they are required to wait to have their last packed box of the day scanned. (Id.) Plaintiffs contend that whether the absence of a system for workers to record their actual time violates California law is a common question that drives certification of the declaratory and injunctive relief class. (Id.) Also, Plaintiffs argue that the monetary relief class also should be certified as the common liability questions predominate over any potential individual issues. (Doc. 66-1 at 24.)

Plaintiffs move for certification of a monetary relief class defined as follows:

1
2

> All persons employed as non-exempt fieldworkers who performed agricultural work for Anthony Vineyards' agricultural operations within the State of California at any time between October 4, 2015 through the date of this action's final disposition.

3

4  (Doc. 66 at 2.) Plaintiffs also move for certification of an injunctive and declaratory relief class

5  defined as follows:

6

> All non-exempt fieldworkers (except crew forepersons) who work in crews and are presently employed by Defendants or are presently eligible to be called back to work with Defendants in upcoming seasons and whose time is maintained by Defendants on crew dailies.

7

8

9  (Id.)

10  ## III.   LEGAL STANDARDS AND ANALYSIS

11        Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

12  provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

13  of all members."  Fed. R. Civ. P. 23(a).  If an action meets the prerequisites of Rule 23(a), the Court

14  must consider whether the proposed class is maintainable under one or more of the three alternatives

15  set forth in Rule 23(b).  *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

16        **A.   Rule 23(a) Requirements**

17        The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed

18  by the named plaintiff's claims."  *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147,

19  155-56 (1982).  Certification of a class is proper if: "(1) the class is so numerous that joinder of all

20  members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

21  defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

22  representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

23  These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of

24  representation.  *Falcon*, 457 U.S. at 156.

25        The party seeking class certification bears the burden of demonstrating the elements of Rule

26  23(a) are satisfied, and "must affirmatively demonstrate . . . compliance with the Rule."  *Wal-Mart*

27  *Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d

28  1304, 1308 (9th Cir. 1977).  The Court must conduct a "rigorous analysis," which may require the

Court "to probe behind the pleadings before coming to rest on the certification question." *Id.*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 160-61). The Court has an affirmative duty to consider the merits of an action "to the extent that they overlap with class certification issues." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("a district court must consider the merits if they overlap with the Rule 23(a) requirements") (citations omitted).  As a result, the Court may consider material evidence submitted by the parties to determine whether the Rule 23 requirements are satisfied. *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).

       1.     Numerosity

      A class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  This requires the Court to consider "specific facts of each case and imposes no absolute limitations." *Gen. Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is no specific numerical threshold, joining more than one hundred plaintiffs is impracticable. *See Immigrant Asst. Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) (identifying several cases in which courts certified classes with fewer than 100 members").  Courts have found the requirement satisfied when the class comprised as few as thirty-nine members or where joining all class members would serve only to impose financial burdens and clog the court's docket. *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citation omitted) (discussing Ninth Circuit thresholds for numerosity); *In re Itel Securities Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981).

      Plaintiffs allege that numerosity is met here, because Defendants admit that they employ close to 1,000 workers during the off season and close to 2,000 workers at the height of the harvest. (Doc. 66-1 at 26; Trabucco Decl., ¶16.) Likewise, Defendants contend that regardless of which of Plaintiffs' class definitions is used, the proposed class is certainly numerous enough. (Doc. 70 at 19.) Thus, the Court finds that Plaintiffs have satisfied their burden, and thus this requirement of Rule 23 is satisfied.

       2.     Commonality

      Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, the class representatives must demonstrate common points of facts and law. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Thus, "commonality requires that the class members' claims depend upon a common contention such that determination of its truth

4

or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks and citations omitted); *see also Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014) (finding commonality satisfied where "[t]he factual and legal questions that [plaintiffs] present can be answered 'yes' or 'no' in one stroke as to the entire class, dissimilarities among class members do not impede the generation of common answers to those questions, and the capacity of classwide proceedings to drive the resolution of this litigation cannot be doubted").

Plaintiffs allege that the common questions that predominate and support certification of the Rule 23(b)(3) class, include:

- Whether Defendants' policy of not disclosing in writing the items required under Labor Code section 2810.5 violates AWPA's disclosure and posting requirements or whether the material omission of this information constitutes false and misleading information.

- Whether Defendants violated AWPA by providing false and misleading information by not disclosing the following practices: (a) the auto-deduction of 30 minutes for meal periods lasting less than 30 minutes, (b) the payment of sick leave at the minimum wage rate as opposed to the statutory rates described in Labor Code section 246, (c) the denial of net-10 minute rest breaks, (d) the denial of rest break and meal period premiums, (e) the failure to record accurately the start and end of work periods, (f) the policy of not providing tools and not reimbursing for tool expenses, and (g) the failure to record accurately all hours worked;

- Whether Defendants failed to pay minimum wage for all pre- and post-shift hours worked.

- Whether Defendants' policy of auto-deducting 30 minutes for meal periods that are less than 30 minutes violates the meal period and minimum wage laws.

- Whether Defendants' policy of providing rest breaks that do not provide for net-10 minutes of rest violates the rest break laws.

- Whether Defendants violated Labor Code section 226.2 by failing to provide separate pay for a second rest break due for shifts greater than 6 hours and less than 8 hours.

- Whether Defendants violated Labor Code section 2802 by failing to provide tools or reimburse the expense of purchasing tools.

- Whether Defendants failed to pay all wages owed at the conclusion of each season, or at the time of termination.

- Whether Defendants failed to provide accurate wage statements stating the total number of hours worked, total pay for all hours worked, payment of premium wages, separately compensating for all paid rest breaks and nonproductive time during piece rate work, and proper accrual of paid sick leave and payment of paid sick leave at the regular rate of pay in the workweek or the average rate in the previous 90 days worked; and

- Whether Defendants are liable for restitution under the UCL for failing to pay sick leave at the regular rate of pay in the workweek or the average rate in the previous 90 days worked as required under Labor Code section 246.

(Doc. 66-1 at 24-25.)

Defendants allege that Plaintiffs repeatedly claim that "Defendants use schedules of shifts as a substitute for employee time records" but offer no evidence that this is true. (Doc. 70 at 19.) According to Defendants, at most Plaintiffs have provided vague and anecdotal evidence regarding their own experiences, without providing evidence showing that their experiences are common to their proposed class. (Doc. 70 at 19.) Defendants further argue that while Plaintiffs may establish that schedules are generally consistent, Plaintiffs offer no evidence for their theory that time records are predetermined, identical, and inaccurate. (Doc. 70 at 20.)

Contrary to Defendants' assertions, the evidence demonstrates that Sycamore Labor maintained a uniform method of physically recording daily field worker schedule and production information for each crew stating the total hours based on the common schedule for that day. (Trabucco Decl. ¶ 33; Doc. 67-21, Rodriguez Depo., 170:2-16; 189:18-190:3; Plaintiffs' Exh. 4 at 2-5.) Class representatives testified to the experiences of the proposed class as a whole. For instance, Sanchez testified that everyone on the crew would arrive early in the morning, about 15 minutes before their shift to collect materials and supplies for the day and attend school. (Doc. 67-27, Sanchez Depo. at 25:7-13.) As to particular issues as discussed in detail below, the Court finds that putative members of the class and the

6

named plaintiffs share similar questions of law and fact.

Accordingly, this Court finds that Plaintiffs satisfy the commonality requirement of Rule 23(a)(2). Plaintiffs identify numerous legal and factual issues common to the proposed members of the class. Plaintiffs have demonstrated that class members share legal questions and the proposed class share a common core of salient facts. *See Aldapa*, 323 F.R.D. at 341; *see also* Parsons, 754 F.3d at 684 (commonality satisfied where "[t]he factual and legal questions . . . can be answered 'yes' or 'no' in one stroke as to the entire class"). Accordingly, the commonality requirement of Rule 23(a)(2) is satisfied. *See Hanlon,* 150 F.3d at 1019-20.

3.     Typicality

This requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Armstrong v. Davis*, 275 F.3d 849, 868 (2001); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when the named plaintiffs have the same claims as other class members and are not subject to unique defenses).  While representative claims must be "reasonably co-extensive with those of absent class members," the claims "need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

"The commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157 n.14.  Typicality inquires whether proposed class representatives "have the same or similar injury" and "have been injured by the same course of conduct" as putative class members. *Hanon*, 976 F.2d at 508.

Plaintiffs claim that typicality is satisfied for the same reasons as commonality. (Doc. 66-1 at 28.) Plaintiffs make the same claims and legal arguments. (Id.) Plaintiffs argue that as fieldworkers, they have claims typical of other fieldworkers that arise out of the common course of Defendants' conduct. (Doc. 66-1 at 28.) Plaintiffs argue also that Defendants' payroll practices, which recorded only scheduled work and not actual hours worked, failed to maintain accurate and complete records, and the practice of failing to pay for actual hours worked violated the working arrangement provision.

(Doc. 71 at 9.) Plaintiffs argue that the common questions identified herein—i.e., the policies, practices, and violations experienced by Plaintiffs—arise out of the common course of Defendants' conduct and are the same ones that are experienced by putative class members. (Doc. 71 at 10.)

Defendants argue that Plaintiffs have not established that their AWPA claims are typical. (Doc. 70 at 20.) According to the Defendants, all of Plaintiffs' AWPA claims are premised on alleged inaccuracies in written materials: (1) information provided to job seekers, (2) information provided on wage statements, or (3) written working arrangements. (Doc. 70 at 20-21.) Defendants argue Plaintiffs have not shown that the alleged wrongful practices exist company-wide, and, consequently, they have not shown that their experiences are reasonably co-extensive with those of the class they seek to represent. (Id. at 21.) Defendants allege that Plaintiffs have put forward no evidence that they personally were provided false or misleading information in violation of AWPA. (Id. at 21.) In reply, Plaintiffs assert that Defendants' own corporate designees admit that the foreman binder contains all the relevant written disclosures, and that identical copies are made available to every single crew. (Doc. 71 at 9.) Plaintiffs argue that because Defendants' foremen binders omitted critical information, including applicable piece rate compensation, they were insufficient and failed to provide accurate and complete written disclosures. (Id.)

The evidence demonstrates that the written disclosures at issue were given to employees every year by Sycamore. (Doc. 67-21, Ramirez Depo. at 239:11-241:8.) These disclosures, providing the rate of pay for the employees, are put into the foreman binder and updated at least once a year. (Doc. 67-22, Aceves Depo. at 30:21-31:22, 35:15-43:3, 43:18-46:8.) Accordingly, the employees were all subject to a common course of Defendants' conduct related to written disclosures.

Furthermore, the employees were subject to the same payroll practices. Defendants have at all relevant times created and kept field worker compensation information in Famous, an electronic database used to input hours and pieces information and process payroll. (Doc. 67, Trabucco Decl. ¶ 41; Doc. 67-19, Loeffel Depo. 138:2-19; Doc. 67-21, Rodriguez Depo. 195:19-196:9.) Defendants utilize a uniform system for all their field workers, which compensates purely on an hourly basis at the California minimum wage during non-harvest seasons (Doc. 67, Trabucco Decl. ¶ 42; Doc. 67-21, Rodriguez Depo. 165:13-166:9), and on an hourly basis at the California minimum wage, plus a piece

8

1    work bonus of $0.35 per box during the harvest (Doc. 67, Trabucco Decl. ¶ 42; Doc. 67-18, Loeffel

2    Depo. 41:20-42:3; Doc. 67-21, Rodriguez Depo. 165:13-166:9).

3        Plaintiffs met the burden to identify the "same or similar injury" as putative class members.

4    *See Hanon*, 976 F.2d at 508. Thus, the typicality requirement is satisfied. *See Armstrong v. Davis*, 275

5    F.3d 849, 868 (2001); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the

6    typicality requirement is satisfied when the named plaintiffs have the same claims as other class

7    members and are not subject to unique defenses).

8        4.    Adequacy of Representation

9        Rule 23(a)(4) dictates that the representative plaintiff must fairly and adequately protect the

10   interests of the class. To satisfy constitutional due process concerns, unnamed class members must be

11   afforded adequate representation before entry of a judgment which binds them. *See Hanlon*, 150 F.3d

12   at 1020 (citing *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940)). "Resolution of two questions determines

13   legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other

14   class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on

15   behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing

16   *Hanlon*, 150 F.3d at 1020); *see also Pierce v. County of Orange*, 526 F.3d 1190, 1202 (9th Cir. 2008).

17       *a.    Proposed class representative*

18       Plaintiffs contend that the proposed class representatives, Sebastiana Martinez-Sanchez and

19   Eugenio Antonio-Cruz, have no conflict of interest with the other members of the class, and assert that

20   their interests are the same as those of the classes and they seek the same remedies. (Doc. 66-1 at 29,

21   citing Sanchez Depo., Cruz Depo.) Plaintiffs further contend that none of the individual Plaintiffs seek

22   personal damages or other individualized relief to the exclusion of other class members, and neither

23   have any interests that are antagonistic to those of the putative class members. (Doc. 71 at 11.)

24   Plaintiffs argue that collusion is absent, and no other conflicts exist which could hinder the individual

25   Plaintiffs' ability to pursue the litigation vigorously on behalf of the class; they will fairly and

26   adequately protect the interests of the class. (Id.)

27       Defendants allege that they did not submit any declarations or affidavits in support of the

28   certification motion and have not established that they are adequate class representatives. (Doc. 70 at

1   20-21.)[1] Plaintiffs note in the reply that Plaintiffs' deposition testimony, cited throughout the moving

2   papers, is sufficient to demonstrate their adequacy to vigorously prosecute this action on behalf of the

3   class. (Doc. 71 at 12, n.2; see also Doc. 67-27, Sanchez Depo.; Doc. 67-28, Cruz Depo.) Moreover,

4   Plaintiffs submitted declarations of named plaintiffs Sebastiana Martinez-Sanchez and Eugenio

5   Antonio Cruz with their reply. (Docs. 73-1, 73-2)

6        Defendants argue that because Plaintiffs propose to include the crew foremen or assistant

7   foremen who recorded time-worked, conducted start-of-shift briefings, and timed meal and rest breaks

8   in all the various class definitions, this creates an inherent conflict of interest among the putative class

9   members. (Doc. 70 at 21.) Plaintiffs assert in reply that though foremen and assistant foremen

10  traditionally wrote the predetermined schedules on daily crew sheets (the equivalent of time entries) or

11  else operated the Pet Tiger application on company phones to note the daily schedule for the crew, their

12  duties were to follow the explicit instructions provided by Defendants. (Doc. 71 at 11.) According to

13  Plaintiffs, foremen and assistant foremen do not have the authority to adjust an individual crew

14  members' time entry to reflect either pre-shift off-the-clock work, post-shift off-the-clock work, or a

15  short, late, or missed rest break or meal period, and that all the training they receive regarding

16  timekeeping dictates that they follow the procedures outlined by Defendants to the letter. (Id.)

17  However, Plaintiffs concede that Defendants' argument that crew leaders are the "architects and

18  enablers of the wage and hour violations" is well taken and may appear to raise a valid concern about

19  the adequacy of Plaintiffs, who were fieldworker laborers, to represent all putative class members;

20  specifically, supervisory employees like foremen and assistant foremen. (Id.) Plaintiffs suggest that to

21

22  [1] Defendants also contend that Plaintiffs present no evidence they will vigorously prosecute the action on behalf of the
    class because named Plaintiffs do not speak, read, or write English or Spanish, limiting their ability to independently
23  review pleadings, discovery, or evidence, or even communicate with other class members. (Doc. 70 at 21.) In reply,
    Plaintiffs assert that courts have long rejected efforts by defendants to use the Rule 23 standards "to defeat the ends of
24  justice by facilitating the dismissal of class action complaints involving unsophisticated named plaintiffs." (Doc. 71 at 9,
    citing Longest v. Green Tree Servicing LLC, 308 F.R.D. 310, 325 (C.D. Cal. 2015).) Plaintiffs allege that "[t]he AWPA is a
25  remedial statute with the asserted purpose of eliminating the history of abuse of farm workers, a vulnerable, often illiterate
    unsophisticated economic group," and to accept Defendants' challenge would undermine protections for Plaintiffs who
26  were the individuals whose protection was contemplated by the act. (Doc. 71 at 9, citing Alfred v. Okeelanta Corp., 1990
    U.S. Dist. LEXIS 21021, at *23-24 (S.D. Fla. July 18, 1990).) It is clear that Plaintiffs understand the lawsuit is about
27  payment of wages, reimbursement of expenses, and penalties for field workers of Anthony Vineyards and Sycamore Labor.
    (See Doc. 73-1, Martinez-Sanchez Decl.; Doc. 73-2, Antonio-Cruz Decl.) A English language limitation does not suggest
28  Plaintiffs will not represent the class vigorously. See, e.g., Aguayo v. U.S. Bank, No. 08-CV-2139 W (LSP), 2015 WL
    13344755, at *5 (S.D. Cal. Jan. 15, 2015).

                                                  10

the extent there is an irreconcilable conflict prohibiting Plaintiffs' ability to represent Defendants' crew leaders (i.e., foremen, assistant foremen, and grower supervisors), the Court may simply limit the class to those persons who would be adequately represented by Plaintiffs—i.e., non-exempt fieldworkers employed by Defendants in non-supervisory positions. (Id.)

Although Plaintiffs allege that the foremen and assistant foremen do not have the authority to adjust an individual crew members' time entries to reflect either pre-shift work off the clock, post-shift work off the clock, or a short, late, or missed rest break or meal period (Doc. 71 at 11), the Court agrees with Defendants' argument that including the crew foremen or assistant foremen, who had authority, at least to some extent, over the fieldworkers such as recording time worked and timing meal and rest breaks, creates an inherent conflict of interest among the putative class members (Doc. 70 at 21). Accordingly, as Plaintiffs have suggested, the Court will limit the class to those persons who would be adequately represented by Plaintiffs, which includes non-exempt fieldworkers employed by Defendants in non-supervisory positions.

Plaintiffs have demonstrated that the named Plaintiffs will vigorously prosecute this action on behalf of the class. (See Doc. 71 at 12, n.2; see also Doc. 67-27, Sanchez Depo.; Doc. 67-28, Cruz Depo.) In both declarations of the named plaintiffs, Martinez-Sanchez and Antonio-Cruz, they submit that they are not seeking any other individualized remedy through this class action lawsuit to the exclusion of other proposed members of the class, they do not think any conflicts exist that could be an obstacle to their capacity to vigorously continue with the litigation in the name of the proposed members of the classes, and collusion is absent here. (Doc. 71-1, Martinez-Sanchez Decl. ¶¶ 7-9; Doc. 71-2, Antonio-Cruz Decl. ¶¶ 7-9.) Thus, the Court finds that Sebastiana Martinez-Sanchez and Eugenio Antonio-Cruz have demonstrated they would be adequate representatives for the putative class members, not including any employees in supervisory positions.

b.    Proposed class counsel

Plaintiffs assert they have chosen accomplished attorneys with significant experience in both complex class action litigation and substantive labor and employment law. (Doc. 66-1 at 29; Trabucco Decl., ¶¶ 1-5; Doc. 66-3, Gomez Decl. ¶¶ 1-7; Doc. 66-4, Morton Decl. ¶¶ 1-7.) Plaintiffs allege that Plaintiffs' counsel are accomplished attorneys with significant experience in both complex class action

11

1  litigation and substantive labor and employment law. (Doc. 71 at 12; Doc. 67, Trabucco Decl. ¶¶1-5;

2  Doc. 66-3, Gomez Decl. ¶¶ 1-7; Doc. 66-4, Morton Decl. ¶¶ 1-7.) Plaintiffs' have provided evidence to

3  support their counsel's adequacy, having highlighted their (1) experience with class actions in general,

4  (2) expertise in the substantive areas of law involved in the action, and (3) general litigation experience

5  and reputation in the legal community. (Doc. 71 at 12.) Defendants assert that although Plaintiffs'

6  counsel have experience working on class actions, they have not shown that they have experience in

7  obtaining class certification or trying the types of claims presented in this action. (Doc. 70 at 22.)

8      The Court finds that Plaintiffs' counsel have provided adequate representation thus far.

9  Moreover, Plaintiffs have demonstrated experience and expertise in class action litigation and

10  substantive labor law. Mr. Gomez states that he has represented agricultural workers in employment

11  disputes since 1998, has litigated dozens of wage and hour class actions throughout California, and has

12  substantial experience in all facets of class action litigation. (Doc. 66-3, Gomez Decl. ¶¶ 5-7.) Mr.

13  Morton states that he has represented agricultural workers in employment disputes for over twenty

14  years, has represented hundreds of immigrant and low-wage worker clients with claims under

15  employment and discrimination statutes, and has substantial experience analyzing and presenting pay

16  violations for farm laborers and other low-wage laborers in class or collective proceedings. (Doc. 66-4,

17  Morton Decl. ¶¶ 4-6.) Additionally, Eric Trabucco, Marco Palau, and Joseph Sutton are founding

18  members of Advocates for Worker Rights LLP. (Doc. 67, Trabucco Decl. ¶¶ 3-5.) Accordingly, the

19  Court finds Plaintiffs' counsel will provide adequate representation.

20      **B.      Certification under Rule 23(b)**

21      As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified

22  if it is maintainable under Rule 23(b).  *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997).*

23  Under Rule 23(b)(1), a class is maintainable if there is a risk of inconsistent or varying adjudications

24  from "prosecuting separate actions by or against individual class members."  Fed. R. Civ. P. 23(b)(1).

25  In addition, a class may be certified if "adjudications with respect to individual class members . . .

26  would be dispositive of the interests of other members not parties to the individual adjudications or

27  would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B).

28  ///

1.    Rule 23(b)(2) Requirements

A class is maintainable under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Supreme Court explained, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class . . . [I]t does not authorize class certification when each member would be entitled to an individualized award of monetary damages." *Wal-Mart,* 564 U.S. at 360-61. The Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, emphasized the crucialness of Rule 23(b)(2)'s "apply-generally-to-the-class" requirement:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." [Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009))]. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.

*Wal-Mart Stores, Inc.*, 564 U.S. at 360.

The Supreme Court also held in  *Dukes* that Rule 23(b)(2) does not authorize class actions "when each class member would be entitled to an individualized award of monetary damages." *Id.* The Supreme Court also held in *Dukes* that only money damages that are "incidental" to, as opposed to central to, the plaintiff's requested relief may be pursued in a class action maintained under Rule 23(b)(2). *Id.* at 360; *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985). Incidental damages are those that "would flow to the class as a whole by virtue of its securing the sought after injunctive relief." *Newberg on Class Actions* § 4:36 (5th ed.) (citing *Dukes*, 564 U.S. at 365). Therefore, the only type of monetary damages that may be sought in Rule 23(b)(2) class actions are those that "are group-based, flow ineluctably from the injunctive or declaratory relief to the class as a whole, and that do not require individualized assessments." *Newberg on Class Actions* § 4:37 (5th ed.)

In their certification motion, Plaintiffs initially sought certification of a declaratory and injunctive relief class of seasonal employees who are currently employed or are slated to return to work

13

for upcoming seasons and subject to these payroll, piece rate, and timekeeping practices. (Doc. 66-1 at 29.) Included are putative class members who were employed at the time the complaint was filed and who are eligible to work in coming seasons and may be called back to do so as they were for several seasons. (Id.) However, class certification under Rule 23(b)(2) is not warranted because, as discussed in detail below, Plaintiffs indicated that they have not been able to locate a class member currently employed by Defendants who is willing to serve as a class representative for an injunctive relief subclass and requested that the Court deny certification of the injunctive relief class without prejudice. (Doc. 80 at 2.)

### 2.     Rule 23(b)(3) Requirements

Federal Rule of Civil Procedure 23(b)(3) requires a finding that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." These requirements are generally called the "predominance" and "superiority" requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart Stores*, 564 U.S. at 363 ("(b)(3) requires the judge to make findings about predominance and superiority before allowing the class").

Class certification under Rule 23(b)(3) is an "adventuresome innovation," and allows for class certification in cases "in which class-action treatment is not clearly called for as it is in Rule 23(b)(1) and (b)(2) situations." *Amchem Prods.,* 521 U.S. at 615.  Thus, a class is maintainable under Rule 23(b)(3) where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and where "a class action is superior to other available methods for fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Where the issues of a case "require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1189 (9th Cir. 2001) (citation omitted). Thus, the Court must examine "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods*., 521 U.S. at 623; *Hanlon*, 150 F.3d at 1022.

### a.     Predominance

Plaintiffs must show more than the mere existence of a single common question of law or fact

1    required by Rule 23(a)(2)—a common question must predominate. *Wal-Mart Stores*, 564 U.S. at 363.

2    The predominance inquiry focuses on "the relationship between the common and individual issues"

3    and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by

4    representation." *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  The Ninth

5    Circuit explained, "[A] central concern of the Rule 23(b)(3) predominance test is whether

6    'adjudication of common issues will help achieve judicial economy.'" *Vinole v. Countrywide Home*

7    *Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser*, 253 F.3d at 1189).

8                              *i.*      *AWPA Liability*

9            Under AWPA, Defendants are subject to disclosure and posting requirements that compel

10   employers to provide accurate details about the employment arrangement, the rates and methods of

11   compensation, and subject the employer to liability for false or misleading information. 29 U.S.C. §§

12   1821(f) and 1831(c). Pay records and wage statements are also subject to accuracy and completeness

13   requirements. 29 U.S.C. §§ 1821(d) and 1831(c).

14           First, Plaintiffs claim that Defendants provided inaccurate and misleading information by failing

15   to disclose that payments were based on schedules. (Doc. 66-1 at 33.) Plaintiffs allege that the AWPA

16   disclosures failed to list piece rate compensation and were not provided directly to workers, and failure

17   to disclose the pay-rate of such work constitutes an AWPA violation and poses a common question of

18   liability. (Doc. 71 at 16.) Defendants assert that each Sycamore foreman keeps a binder of various

19   workplace postings, notices, and disclosures. (Doc. 70 at 25.) Defendants claim that Plaintiffs ignore

20   the fact that Sycamore included a disclosure form entitled U.S. Department of Labor Wage and Hour

21   Division "Worker Information-Terms and Conditions of Employment" containing all the information

22   required by AWPA. (Id.) Defendants allege that the form itself states that it can be used to disclose the

23   required information. (Id.) In response to Defendants' allegation that there is no facial AWPA

24   disclosure violation because they used a Department of Labor form template, Plaintiffs contend that

25   this form is only a template and does not include all required information. (Doc. 71 at 15.) Plaintiffs

26   allege that the AWPA disclosures failed to list piece rate compensation and were not provided directly

27   to workers.

28           Each Sycamore crew foreman keeps a binder in the field that contains copies of various forms,

notices, policies, and programs. (Doc. 70-2, Defendants' Exh. E, Alvidrez Decl. ¶ 3.) The evidence demonstrates that the foremen binders contain disclosures regarding hours, pay, and work information relating to field workers. (Doc. 67, Trabucco Decl. ¶ 55.) Karina Aceves, one of Sycamore Labor's food and safety supervisors, testified that the foremen binders contain postings required by state, federal, and county law, and the employees are informed that the binders are made available to them. (Doc. 67-22, Aceves Depo. at 28:19-30:20, 33:25-35:13.) Foremen binders specifically contain announcements about California minimum wage and Wage Order 14 (in English and Spanish) and are replaced if updated. (Doc. 67-22, Aceves Depo. at 43:4-17, 48:8-49:15.) The foreman binder also includes the United States Department of Labor, Wage and Hour Division form, "Worker Information-Terms and Conditions of Employment," which is replaced if and when it is updated. (Id.; Defendants' Exh. L.) The foreman binder also includes a similar California form, Division of Labor Standards Enforcement form 445: "Farm Labor Contractor—Statement of Pay Rates." (See Defendants' Exh. M.) Also included in the foremen binders is Anthony Vineyards and Sycamore labor illness and injury prevention program documents. (Trabucco Decl. ¶ 56; Doc. 67-21, Rodriquez Depo. at 216:24-217:14.)

The foreman binders are usually kept at the shade trailer, and they are available to the employees, but these documents are not distributed individually to the employees. (Doc. 67-23, Alvidrez Depo. at 65:11-67:15.) Alvidrez testified that the piece rate information was not provided to employees in writing; this information was left blank in the disclosures because it varied based on where the crew is working. (Doc. 67-23, Alvidrez Depo. at 67:16-70:1.) Field workers' piece rate(s) of pay are instead verbally communicated to field workers during the start of the harvest season. (Doc. 67-21, Rodriquez Depo. at 247:25-251:24; Doc. 67, Trabucco Decl. ¶ 55.) Other information that is posted for the employees (at the shade trailers) includes heat stress documents, California Wage Order 14, and Cal-OSHA postings, and these postings are updated periodically if there are changes. (Doc. 67-21, Rodriquez Depo. at 247:25-251:24.) Loeffel testified that state and federal employment guidelines, including relevant provisions regarding rest breaks, are also posted for the employees. (Doc. 67-19, Loeffel Depo. at 181:2- 184:2.)

The evidence demonstrates that Defendants had a uniform policy of providing information to the employees. For instance, the Department of Labor form template that Defendants rely on to satisfy

disclosure obligations was included in the foreman binders and was made available to all workers. Whether this form template contained all the disclosures required by AWPA as Defendants argue is not pertinent to the determination of class certification regarding this claim. Significantly, the evidence shows that disclosures were provided in the same way to all employees, i.e., by each Sycamore foreman keeping a binder of various workplace postings, notices, and disclosures that was made available to all workers, by various postings at the shade trailer and/or by verbal communication.

Regarding Plaintiffs' allegation that the AWPA disclosures failed to list piece rate compensation and were not provided directly to workers, the evidence demonstrates that Defendants uniformly provided this information verbally to the employees but it was not provided to employees in writing. Both Ramiro Rodriguez, Sycamore Labor's President, and Mayra Alvidrez, Sycamore Labor's Office Manager, testified that the piece rate information was left blank in the disclosures and was instead verbally communicated to employees at the start of the harvest season. (Doc. 67-23, Alvidrez Depo. at 67:16-70:1; Doc. 67-21, Rodriquez Depo. at 247:25-251:24.) There is no evidence presented demonstrating that any one worker was delivered piece rate information differently than other members of the crew.

Plaintiffs demonstrated that common questions would predominate over individual issues with respect to their claims that Defendants violated AWPA, as required for class certification of their claims. Any alleged deficiencies in disclosures provided to employees would be universal to the entire class, and this is because Defendants' practices for distributing information were uniformly applied to all class members. Therefore, whether and the extent to which these alleged deficiencies did in fact occur are factual determinations that can be made using objective records, such as a review of the foreman binders and posted information. The question of whether Defendants had a policy of providing misleading information is a common question and is appropriate for certification. *See Torres v. Mercer Canyons, Inc.*, 305 F.R.D. 646, 654 (E.D. Wash. 2015).

Relatedly, Plaintiffs contend that Defendants violated the working arrangement by violating the promise to pay for all compensable hours worked and by failing to provide accurate written notice as required by Labor Code section 2810.5. (Id., citing 29 U.S.C. §§ 1822(c) and 1832(c).) AWPA prohibits employers from violating the terms of the "working arrangement" with a seasonal worker

1  "without justification." 29 U.S.C.A. § 1832(c). "[A] working arrangement under AWPA constitutes

2  the terms of employment communicated between employer and employee." *Valenzuela v. Giumarra*

3  *Vineyards Corp.*, 619 F. Supp. 2d 985, 993 (E.D. Cal. 2008). Defendants assert that Plaintiffs have not

4  shown that Defendants failed to provide any worker with a written notice as required by Labor Code

5  section 2810.5. (Doc. 70 at 27.) As demonstrated above, each employee was provided access to all the

6  same written disclosures, whether through foreman binders or posted information. Accordingly, for

7  purposes of this order, the question of whether Defendants violated the terms of the working

8  arrangement or provided written notice pursuant to Labor Code section 2810.5 is subject to the same

9  proof for each of the class members. Accordingly, the common question of whether Defendants

10  violated the working arrangement provision presents an issue appropriate for certification. *See, e.g.*,

11  *Saur v. Snappy Apple Farms, Inc.*, 203 F.R.D. 281, 287 (W.D. Mich. 2001) (finding AWPA suit,

12  including working arrangement claims that focused on legality of defendants' wage practices "an

13  exceptionally appropriate case for certification").

14         Plaintiffs next claims relate to record keeping and whether employees were paid for all

15  compensable hours worked. Anthony Vineyards Ranch Managers utilize a standardized system of

16  scheduling that all Sycamore Labor crews must observe. (Trabucco Decl. ¶ 20; Doc. 67-18, Loeffel

17  Depo. at 81:1-83:3; Doc. 67-20, Rodriguez Depo. at 106:21-108:7; Doc. 67-24, Eddy Depo. at 28:21-

18  29:11.) A typical shift starts at 7:00 a.m., with a 10-minute morning break from 9:00 a.m. to 9:10 a.m.,

19  a 30-minute unpaid lunch from 11:00 a.m. to 11:30 a.m., an afternoon break from 1:30 p.m. to 1:40

20  p.m., and a shift end time of 3:30 p.m. (Trabucco Decl. ¶ 20; Doc. 67-18, Loeffel Depo. at 83:3-84:1;

21  Doc. 67-20, Rodriguez Depo. at 124:20-125:8, 130:5-131:6.) This schedule is the standardized

22  schedule that Defendants dictate each workday. (Id.) Generally, if a scheduled start time is established,

23  all Sycamore Labor crews start at that time. (Trabucco Decl. ¶ 21; Doc. 67-20, Rodriguez Depo. at

24  108:8-22, 125:19-126:5, 129:11-14; Doc. 67-24, Eddy Depo. at 28:14-29:14.) Once a schedule has

25  been established, that schedule is observed until an Anthony Vineyards Ranch Manager says

26  differently. (Id.) The scheduled start time varies in set 30-minute increments based on sunlight and high

27  heat conditions. (Id.) Crews start work at either 5:30, 6:00, 6:30, or 7:00 in the morning. (Defendants'

28  Exh. C, Ramiro Rodriguez Decl. at ¶ 30.)

1   Sycamore has no separate written policy on worker timekeeping. (Defendants' Exh. C, Ramiro
2   Rodriguez Decl. at ¶ 20.) Each crew's foreman is responsible for keeping track of the time worked by
3   the persons on that crew. (Defendants' Exh. C, Ramiro Rodriguez Decl. at ¶ 20.) Some foremen
4   delegate aspects of this responsibility to an assistant. (Defendants' Exh. C, Ramiro Rodriguez Decl. at
5   ¶ 20.)

6   In 2017, when Sycamore was founded, foremen used crew sign-in sheets (often referred to as
7   "dailies") to keep track of the time worked by the crew. (Defendants' Exh. C, Ramiro Rodriguez Decl.
8   at ¶ 21.) Individual workers would sign these sheets to ensure they were credited with working that
9   day. (Defendants' Exh. C, Ramiro Rodriguez Decl. at ¶ 21.) Foremen would note on the sheet if
10  individual workers arrived late or left early. (Defendants' Exh. C, Ramiro Rodriguez Decl. at ¶ 21.)
11  Foremen also noted the time rest breaks and lunch were taken on these daily sheets. (Defendants' Exh.
12  C, Ramiro Rodriguez Decl. at ¶ 21.) The dailies were the originating document that would form the
13  basis for Sycamore Labor's invoices to Anthony Vineyards for labor costs of field worker hourly and
14  piece rate work for a week. (Trabucco Decl. ¶ 22; Doc. 67-19, Loeffel Depo. at 98:17-20; Doc.67-20,
15  Rodriguez Depo. at 55:20-56:15, 76:19-78:2; see Plaintiffs' Exhs. 3, 4.) Sycamore Labor maintained a
16  uniform method of physically recording daily field worker schedule and production information for
17  each crew stating the total hours based on the common schedule for that day. (Trabucco Decl. ¶ 33;
18  Doc. 67-21, Rodriguez Depo., 170:2-16; 189:18-190:3; Plaintiffs' Exh. 4 at 2-5.)

19  Sycamore Labor implemented the electronic time and production tracking system called PET
20  Tiger after mid-2018. (Trabucco Decl. ¶ 34; Doc. 67-19, Loeffel Depo. at 96:18-98:16, 147:13-148:7;
21  Doc. 67-20, Rodriguez Depo. at 86:8-87:1, Doc. 67-21, Rodriguez Depo. at 204:23- 205:3; Doc. 67-25,
22  Rodriguez Depo. at 80:2-24, 130:7-131:20; Defendants' Exh. C, Ramiro Rodriguez Decl. at ¶ 23.) But
23  rather than using the system to record field worker timekeeping contemporaneously, Sycamore Labor
24  makes foremen or assistant foremen scan field worker's badges for attendance using a cell phone
25  equipped with the PET Tiger application, but then manually enter work, break and lunch events for the
26  entire crew based on the common daily schedule. (Id.; see Plaintiffs' Exhs. 20, 21.)

27  Defendants have at all relevant times created and kept field worker compensation information in
28  Famous, an electronic database used to input hours and pieces information and process payroll.

(Trabucco Decl. ¶ 41; Doc. 67-19, Loeffel Depo. at 138:2-19; Doc. 67-21, Rodriguez Depo. at 195:19-196:9.) Defendants utilize a uniform system for all their field workers, which compensates purely on an hourly basis at the California minimum wage during non-harvest seasons (Trabucco Decl. ¶ 42; Doc. 67-21, Rodriguez Depo. at 165:13-166:9; Plaintiffs' Exh. 2, Doc. 67-1 at 5; Plaintiffs' Exh. 13, Doc. 67-8 at 7-12), and on an hourly basis at the California minimum wage, plus a modest piece work bonus of $0.35 per box during the harvest (Trabucco Decl. ¶ 42; Doc. 67-18, Loeffel Depo. at 41:20-42:3; Doc. 67-21, Rodriguez Depo. at 165:13-166:9; Plaintiffs' Exh. 2, Doc. 67-1 at 5; Plaintiffs' Exh. 13, Doc. 67-8 at 7-12).

Before the PET Tiger system, field worker hours and piece work information were entered into Famous directly from the dailies or weekly summary documents. (Trabucco Decl. ¶ 43; Doc. 67-19, Loeffel Depo. at 133:9-135:21; Doc. 67-21, Rodriguez Depo. at 172:17-176:23; 196:10-25; see, generally, Plaintiffs' Exh. 5, Doc. 67-4, Plaintiffs' Exh. 23, Doc. 67-17.) Following the implementation of PET Tiger, a Sycamore Labor office employee checks each crew's entries before saving a "Job Card" file for each crew in PET Tiger, and then importing the data into Famous and processing payroll. (Trabucco Decl. ¶ 44; Doc. 67-25, Rodriguez Depo. at 115:21-120:19; Doc. 67-23, Alvidrez Depo. at 13:7-17:9, 17:20-24:12.) Sycamore Labor's office manager then prints the final payroll report and paychecks for all crews and emails the grower a copy of each crew's payroll information. (Id.) In 2018, approximately 50% of Sycamore Labor's payroll was processed by importing data from PET Tiger into Famous. (Trabucco Decl. ¶ 46; Doc. 67-21, Rodriguez Depo., 198:22-199:20; Doc. 67-23, Alvidrez Depo. at 81:24-83:1.) By 2020, virtually all of Sycamore Labor's payroll was processed from the PET Tiger database into Famous. (Id.; Defendants' Exh. C, Ramiro Rodriguez Decl. at ¶ 23.)

Sycamore Labor uses the same pay codes to compensate field workers. (Trabucco Decl. ¶ 47; Doc. 67-19, Loeffel Depo. at 173:10-179:4; Doc. 67-21, Rodriguez Depo. at 210:14-213:23; Plaintiffs' Exh. 8, Doc. 67-5.) Sycamore Labor paychecks and wage statements provide field workers their hourly and piece work compensation information, including but not limited to: hours worked, hourly rate and hourly pay; pieces earned, piece rate and piece work pay; nonproductive hours, nonproductive rate of pay taking into account all earnings on a daily basis, and nonproductive pay. (Trabucco Decl. ¶ 47; Doc. 67-19, Loeffel Depo. at 169:2-25; Doc. 67-21, Rodriguez Depo. at 223:11-228:13, 229:10-17,

235:13-237:1.) During the harvest, rest breaks are supposed to be paid separately, taking into account the field worker's piece rate production. (Trabucco Decl. ¶ 45; Doc. 67-19, Loeffel Depo. at 177:14-179:4; Doc. 67-21, Rodriguez Depo. at 218:6-219:22; Doc. 67-25, Rodriguez Depo. at 152:13-153:17.) PET Tiger and Famous track and calculate such time for each field worker earning piece rate. (Id.) Wage statements include information regarding the accrual, use, and payment of sick leave hours, which is automatically recorded and calculated for all field workers by Famous and appears to be compensated at the applicable California minimum wage rate, even during the harvest. (Id.; see, generally, Plaintiffs' Exh. 35, Doc. 67-31, Plaintiffs' Exh. 40, Doc. 67-36.)

Plaintiffs allege that Defendants' wage statements and record-keeping violated the AWPA because Defendants are obligated to make, keep, and maintain accurate employment records and provide that information in itemized wage statements to Plaintiffs. (Id., citing 29 U.S.C. §§ 1821(d) and 1831(c).) AWPA requires employers to keep records of various information, including "the number of hours worked." 29 U.S.C.A. § 1831(c)(1). Plaintiffs assert that employment records and wage statements, which fail to accurately record hours, violate the AWPA, and inaccurate record claims, as part of an alleged practice or policy, are appropriate for class certification. (Doc. 66-1 at 33.) Defendants take issue with the fact that "Plaintiffs do not allege that Defendants' time records were arbitrarily shaved, or that Defendants failed to keep copies of paystubs." (Doc. 70 at 27.)

As the foregoing evidence demonstrates, Sycamore Labor implemented a standardized system of scheduling and maintained a uniform method of physically recording daily field worker schedule and production information for each crew based on the common schedule for that day. The alleged deficiencies in the wage statements apply universally to the entire class, and this is because Defendants' practices for creating wage statements were uniformly applied to all class members. Whether and the extent to which these alleged deficiencies did in fact occur are factual determinations that can be made using objective records, such as a review of the actual wage statements and Defendants' system for creating the wage statements, including review of the dailies, the electronic time and production tracking system PET Tiger, and the electronic database used to input hours and pieces information and process payroll called Famous. Notably, even after implementation of a more sophisticated method for timekeeping, the PET Tiger system, the start times for each employee were

21

still adjusted to reflect one start time for the entire crew. In other words, the PET Tiger system would allow for employee ID badges to be scanned at the start of shifts, but even if a badge was scanned before or after that time, it would be adjusted to the set start time for the entire crew (5:30 a.m., 6:00 a.m., 6:30 a.m. or 7:00 a.m.) (See Doc. 67-21, Rodriguez Depo. at 189:18-190:3.) Accordingly, the same generalized, class-wide proof will suffice for each member of the class to make a prima facie showing of the wage statement claim. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) (citing *Newberg on Class Actions* § 4:50 (5th ed.)). The issues of whether Defendants had a practice or policy of producing inaccurate employment records is appropriate for class certification. *See, e.g.*, *Escolastico De Leon-Granados v. Eller & Sons Trees*, No. 1:05-CV-1473-CC, 2006 U.S. Dist. LEXIS 73781, at *46 (N.D. Ga. Sep. 28, 2006) (certifying AWPA class alleging "failing universally to keep accurate records").

Because the evidence demonstrated commonality regarding Defendants' policies regarding disclosures and record keeping, the proposed class issues are "sufficiently cohesive to warrant adjudication by representation." *See Amchem Prods.*, 521 U.S. at 623; *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("because there are no individualized issues sufficient to render class certification under Rule 23, class issues predominate"). Therefore, Plaintiffs met the burden to show common questions predominate over the class claims as to these issues.

        *ii.*     *Pre- and Post-Shift Minimum Wage Violations*

Employers are required to compensate for all hours worked, this includes time employees are (a) required to work, (b) time that is spent under employer control, and (3) time that is suffered or permitted, even if not required. 8 Cal. Code Regs. § 11140(2); *Morillion v. Royal Packing Co.,* 22 Cal.4th 575 (Cal. 2000). Plaintiffs allege that the questions in this case revolve around Defendants use of imprecise timekeeping to determine and compensate for hours worked. (Doc. 66-1 at 35.)

Rather than noting the specific shift start, break, lunch, or shift end times for each employee, the times written by foremen or assistant foremen on dailies were simply a reflection of the pre-determined schedule applicable to all crews for the day. (Doc. 67, Trabucco Decl. ¶ 23; Doc. 67-19, Loeffel Depo. at 98:17-20; Doc. 67-21, Rodriguez Depo. at 161:25-163:5; Ex. 4 at 2-5.)

During non-harvest seasons, every crew foreman would give "school" to all field workers

covering that day's work at or near the foreman trailer at the scheduled start time, mandatory for every field worker and lasting approximately 15 minutes. (Doc. 67-18, Loeffel Depo. at 84:2-86:16; Doc. 67-20, Rodriguez Depo. at 131:10-133:21; Defendants' Exh. H, Eddy Depo. at 57:18-58:12.) If the scheduled start time was 7:00 a.m., field workers from every crew would have been expected to be lined up and present at their respective foremen's "school" at 7:00 a.m. (Id.) Though Sycamore Labor's verbal policy is to have field workers sign in on dailies after the conclusion of "school," some foremen have field workers sign dailies before the start of the shift and "school." (Doc. 67-26, Moreno Depo. at 51:20-55:22; Doc. 67-27, Sanchez Depo. at 19:3-21:11; Doc. 67-28, Cruz Depo. at 43:3-45:1; Doc. 69, Martinez Decl. at ¶¶ 6-7, 10.) In addition to writing their names and signing dailies, all field workers must sign other sheets certifying they received the training or "school" offered every morning. (Doc. 67-26, Moreno Depo. at 37:3-41:5.) This process of lining up to wait to sign these documents could be a lengthy one, especially in a crew of 80 or more field workers, and typically lasted between 10 and 15 minutes before the scheduled start of the shift. (Doc. 67-27, Sanchez Depo. at 19:3-21:11; Doc. 67-28, Cruz Depo. at 43:3-45:1.)

Mayra Alvidrez, Sycamore's office manager, testified that foreman, assistant foreman, and scale boy arrive early to get materials ready so that workers do not need to do any type of work prior to their shift start time. (Defendants' Exh. F, Alvidrez Depo. at 103:21-105:20.) However, some class members also confirm that they had to retrieve materials used during the harvest before the scheduled start of the shift. (Doc. 67-27, Sanchez Depo. at 24:17-26:5; Doc. 67-28, Cruz Depo. at 13:14-24, 44:19-45:1; Doc. 69, Martinez Decl. at ¶¶ 6-7, 10.)

Near the end of the shift, foremen would tell field workers that the end of the shift was coming up. (Doc. 67-18, Loeffel Depo. at 89:22-90:5; Doc. 67-20, Rodriguez Depo. at 152:6-153:17; Defendants' Exh. B, Loeffel Depo. at 90:6-12; Defendants' Exh. H, Eddy Depo. at 62:15-63:16.) At the shift end time, field workers would begin making their way out of the vineyard rows, which took up to five minutes from the area in the rows where they were working. (Id.) The work and clean-up are completed at or before the scheduled end of the shift. (Defendants' Exh. B, Loeffel Depo. at 118:13-23.)

During the harvest, the process for starting the shift was identical to non-harvest seasons, and

the process for announcing, starting, taking and ending the morning break, lunch, and the afternoon break was identical to non-harvest seasons. (Doc. 67-18, Loeffel Depo. at 90:25-91:22; Doc. 67-21, Rodriguez Depo. at 156:2-24.) During the harvest, foremen would make an announcement approximately 15 minutes prior to the end of the shift, prompting field workers to stop picking, and for groups to work together to finish packing their final box(es) of already-clipped bunches of grapes, while remaining present to ensure that the box checker credits their last box(es) in writing. (Doc. 67-18, Loeffel Depo. at 91:23-92:12; Doc. 67-21, Rodriguez Depo. at 156:25-158:6, 158:10-160:18; Doc, 67-24, Eddy Depo. at 62:7-63:16; Doc. 67-25, Rodriguez Depo. at 157:1-23.) However, because it could take box checkers some time to attend to every row and scan their final packed boxes, field workers routinely were incentivized to wait until after the end of the shift to be credited by box checkers. (Doc. 67-27, Sanchez Depo. at 27:12-21; 29:3-15; Doc. 67-23, Alvidrez Depo. at 85:7-15, 119:21-120:12; Martinez Decl. at ¶¶ 8-9.)

The Court holds that this issue presents "a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of [the] claim in one stroke" as required under *Wal-Mart*. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013). The common question is whether the class members performed uncompensated and unrecorded work outside the scheduled shift.

According to the evidence, Sycamore Labor maintained a uniform method of physically recording field worker schedule and production information in the form of dailies, which are filled out for each crew stating the total hours credited to field workers based on the common schedule for that day. (Doc. 67-21, Rodriguez Depo. at 170:2-16; 189:18-190:3; Ex. 4 at 2-5.) Rather than noting the specific shift start, break, lunch, or shift end times for each employee, the times written by foremen or assistant foremen on dailies were simply a reflection of the pre-determined schedule applicable to all crews for the day. (Doc. 67, Trabucco Decl. ¶ 23; Doc. 67-19, Loeffel Depo. at 98:17-20; Doc. 67-21, Rodriguez Depo. at 161:25-163:5; Ex. 4 at 2-5.)

It is beyond dispute that to the extent Plaintiffs engaged in voluntary pre-shift work, Defendants are liable under relevant California law for additional wages or overtime for that work. The recordings do not account for any time before the scheduled start time that workers were required

1    to be present. Defendants offer evidence to show that workers are not permitted to start working

2    before the scheduled start time. (See Defendants' Exh. H Rope Eddy Dep. 52:24-53:9.) However, the

3    evidence demonstrates that the workers were uniformly required to attend the training or school and to

4    sign in on dailies prior to the shift start time and sign other sheets certifying attendance at the training.

5    (See Doc. 67-26, Moreno Depo. at 37:3-41:5.) Training or class is mandatory, and the foreman give a

6    school or class every day. (Trabucco Decl. ¶ 24; Doc. 67-26, Moreno Depo. at 40:23-25.) The class

7    representative testified that everyone on the crew would arrive early in the morning, about 15 minutes

8    before their shift to collect materials and supplies for the day and attend school. (Doc. 67-27, Sanchez

9    Depo. at 25:7-13.) Additionally, although there was a scale boy that arrived early to get materials

10   ready (Defendants' Exh. F, Alvidrez Depo. at 103:21-105:20), class members confirm that they had to

11   retrieve materials used during the harvest before the scheduled start of the shift. (Doc. 67-27, Sanchez

12   Depo. at 24:17-26:5; Doc. 67-28, Cruz Depo. at 13:14-24, 44:19-45:1; Doc. 69, Martinez Decl. at ¶¶

13   6-7, 10.) Even if it were the case that some workers did not have to retrieve any materials prior to the

14   start of shift, each worker was uniformly required to sign in and attend the school every morning, and

15   the timekeeping system did not account for this time for any worker. The majority of the claims of

16   pre-shift work described setting up the work area, attending school, and signing in to the daily. Since

17   this activity surely would be done in areas under a foreperson's management, there is not dispute that

18   this time is spent under employer control. See 8 Cal. Code Regs. § 11140(2).

19          Defendants would also be liable for additional wages for any post shift work. The evidence

20   demonstrates that during harvest season foremen would prompt fieldworkers to stop working prior to

21   the end of the shift to allow for them to finish packing their boxes. However, the box checkers had to

22   attend to every row and scan final packed boxes and workers were incentivized to wait until after the

23   end of the shift to be credited by box checkers. Workers stack their boxes at the front of their row

24   where they are working and see their box scanned right in front of them. (Doc. 67-25, Rodriguez

25   Depo. at 157:1-23.) Any time workers stayed post shift was not accounted for because, as previously

26   described, the dailies were simply a reflection of the pre-determined schedule. Because each worker

27   would be subject to waiting more or less time for their boxes to be scanned depending on the location

28   of their row, there may be individualized questions regarding the amount of time each worker had to

stay post-shift. However, the mere fact that individualized inquiries may potentially occur is not sufficient to defeat the predominance requirement. *See Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). The evidence on the class certification record suggests that the question can be resolved for dozens of class members on a common factual platform. The fact that the amount of post-shift work performed likely varied does not defeat class certification on this issue. *See Leyva v. Medline Indus.,* 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3).").

Moreover, Defendants make no claim that the uncompensated time resulted from a failure or inability to keep proper payroll records of pre-shift and post-shift work. In fact, Plaintiffs have highlighted that the advanced timekeeping system (PET Tiger) was accessible to Defendants and was not being utilized and instead the foremen were continuing to use paper records and filled in the dailies with the predetermined schedule for each worker. The evidence demonstrates that Defendants had a common policy or practice for their timekeeping method to compensate for hours worked. Defendants had a policy of batch-recording the shift start time and end time for all crews based on scheduled time, without adjusting for additional work that may have been performed before and after the shift. Additionally, though the duration that some of the employees worked pre-shift and post-shift may be short, Defendants have not alleged that it was not administratively possible to record such time. A common question that predominates over individualized questions is whether Defendants are required to record small amounts of time that are not administratively incapable of being captured.

As discussed, "the key inquiry is not whether the plaintiffs have raised common questions, 'even in droves,' but rather, whether class treatment will 'generate common answers apt to drive the resolution of the litigation.' " *Abdullah,* 731 F.3d at 957 (citing *Wal-Mart,* 131 S.Ct. at 2551.) The common question is whether the class members performed uncompensated and unrecorded work before and after the scheduled and recorded hours. In conclusion, given the specific factual inquiry to be made in the present case, the Court finds from the evidence that there is a common question as to whether uncompensated work was performed pre and post shift and that resolution of this common question adversely to Defendants may be the basis for potential liability.

///

*iii.     Meal Period and Minimum Wage Violations*

Wage Order No. 14 requires employers to "authorize and permit all employees after a work period of not more than five (5) hours to take a meal period of not less than thirty (30) minutes." 8 Cal. Code Regs. § 11140(11). If an employee is working no more than six hours during a day, then the employee may validly waive a meal break by mutual consent from both the employee and the employer. *Id*. During the meal break, the employer may not require the employee to work unless the parties have executed a written agreement to an "on duty" meal break, which is required by the nature of the work. Cal. Lab. Code § 226.7; 8 Cal. Code Regs. § 11140(11). Generally, the employer's duty to provide a meal break is discharged "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1040 (2012).

Plaintiffs claim that Defendants' policy and practice is to neither record accurately time that is off-duty and unpaid, while automatically deducting 30 minutes of pay regardless of the length of time provided for the meal period. (Doc. 66-1 at 37.) Plaintiffs report that workers are not allowed to eat in the rows where they work and are required to walk to a break area where eating is permitted. (Id.) Plaintiffs allege that time spent walking to break areas cuts into the 30-minute meal period and is unpaid. (Id.) Plaintiffs contend that Defendants' policy of deducting meal period time without contemporaneous time entries, and admissions about meal period timing and the requirement that employees walk to suitable break areas during off-duty time, raise questions of liability for meal premiums and wrongfully deducted wages, and these issues are capable of class-wide resolution. (Doc. 66-1 at 38.)

According to Defendants, Plaintiffs do not allege that their meal periods were interrupted, or that they continued to work after the start of their meal periods; instead, they allege that their meal periods were exactly 30 minutes long and assert that Defendants should have provided them with meal periods that were more than 30 minutes long. (Doc. 70 at 32.) Defendants contend that even if the Court was inclined to view Plaintiffs' legal theory as a common issue, predominance would still not be shown, because the Court would then have to determine whether individuals actually took a 30-minute

1  meal period, either by taking their meal period in the row or by recognizing that it would be time to

2  take a break and beginning to walk to their car or the shade structure. (Id. at 33.)

3          Sycamore requires field employees to take a meal break before their fifth hour of work.

4  (Defendants' Exh. K, Aceves Depo. 66:6-10.) Employees are provided a 30-minute unpaid meal

5  period four hours after the start of their shift. (Defendants' Exh. B, Loeffel Dep. 89:1-4, 199:23-200:8;

6  Defendants' Exh. D, Rodriguez Depo. 130:17- 21; Defendants' Exh. G, Moreno Depo. 77:10-12.)

7  Employees are free to take their breaks in the rows. (Defendants' Exh. K, Aceves Depo. 75:3-12.)

8  They can eat in areas that have already been harvested (Defendants' Exh. G, Moreno Depo. 87:20-

9  90:2), but not in areas that are currently being harvested (Defendants' Exh. K, Aceves Dep. 75:5-

10 76:15). They would also need to walk out of the rows if they need to use the restroom. (Defendants'

11 Exh. B, Loeffel Depo. 201:4-6.) Employees are free to keep their lunch with them, at the shade trailer,

12 or in their car. (Defendants' Exh. K, Aceves Depo. 75:13-22.) Employees do not work during their

13 meal period. (Defendants' Exh. B, Loeffel Depo. 127:2-11, Defendants' Exh. H, Eddy Depo. 60:7-16.)

14         Field workers who work a normal 8 hour and 30-minute shift are credited for 8 hours of work

15 per day, because Sycamore Labor auto-deducts 30 minutes for field workers' unpaid meal periods.

16 (Doc. 67, Trabucco Decl. at ¶ 52; Doc. 67-19, Loeffel Depo. at 203:14-204:5; Doc. 67-20, Rodriquez

17 Depo. at 150:11-21; Doc. 67-21, Rodriguez Depo. 231:22-232:8.) Ordinarily, one might refer back to

18 the time entries written on dailies or manually entered on Pet Tiger to determine if field workers

19 actually took lunch, and Sycamore Labor's practice is to record the day's common schedule as the

20 entire crew's lunch time entries, rather than each individual field workers' specific lunch start and end

21 time. (Doc. 67-19, Loeffel Depo at 203:14-204:5; Doc.67-21, Rodriquez Depo. at 232:9-25; Plaintiffs'

22 Ex. 4 at p. 2; Ex. 20 at p. 3.) Additionally, it takes no more than 5 minutes for field workers to walk

23 from inside the vineyard where they are working to the edge of the rows to take their lunch. (Doc. 67-

24 20, Rodriquez Depo. at 152:24-153:10; Doc. 67-21, Rodriquez Depo. at 157:21-158:6.) It took field

25 workers more than 1 minute and up to 5 minutes from the start of their 30-minute unpaid lunches to

26 travel from their work area to the end of the row where they could rest and eat and were not given a

27 longer lunch or extra time at the beginning or end of their lunch to account for that travel time. (Doc.

28

1   67-27, Sanchez Depo. at 41:12-44:10, 62:7-25; Ex. 32, Cruz Depo. at 15:13-17, 53:7-14; Martinez

2   Decl. at ¶¶ 11-12.)

3         The evidence shows that Defendants provided its employees with 30-minute meal breaks and

4   the employees could choose for themselves where to take the provided lunch breaks. Plaintiffs are not

5   alleging that Defendants failed to provide 30-minute meal breaks or that the meal periods were

6   interrupted. Instead, Plaintiffs contend that employees were required to walk to a suitable break area

7   that could be a substantial distance from where they are working. (Doc. 66-1 at 37.) There is no issue

8   regarding whether employees were required to work during the meal period break. (See Defendants'

9   Exh. B, Loeffel Depo. 127:2-11, Defendants' Exh. H, Eddy Depo. 60:7-16.) The theory of Plaintiffs'

10  meal break claim is, according to the certification motion, that time spent walking to break areas cuts

11  into the 30-minute meal period and is unpaid. (Doc. 66-1 at 37.) However, the evidence demonstrates

12  that though employees were not permitted to eat in rows that were being harvested because of food

13  safety issues (Defendants' Exh. K, Aceves Dep. 75:5-76:15), they could eat in areas that have already

14  been harvested (Defendants' Exh. K, Aceves Depo. at 74:17-24; Defendants' Exh. G, Moreno Depo.

15  87:20-90:2). Gloria Moreno, Sycamore's Safety Director, testified that employees are permitted to

16  keep their food in the vines with them in a sealed container as long as it is kept five vines away from

17  where they are working. (Moreno Depo. at 87:20-90:2.) Moreno also testified that she has "not seen

18  how every single person brings their lunch" (Moreno Depo. at 89:18-90:2), but employees are free to

19  keep their lunch with them, at the shade trailer, or in their car (Defendants' Exh. K, Aceves Depo.

20  75:13-22). Karina Aceves, another one of Sycamore Labor's Food and Safety Supervisors, further

21  testified that most of the workers typically store "their lunch pails, their chairs, or whatever it is that

22  they bring in the vines with them." (Aceves Depo. at 75:3-22.) It appears that the named plaintiffs,

23  Martinez-Sanchez and Antonio-Cruz, testified in terms of "we," seemingly referring to the entirety of

24  their crew in relation to the meal breaks. However, evidence presented by Defendants demonstrates

25  that other crew members had different options for where to take their meal break, which undermines

26  Plaintiffs' theory that all members of the class were deprived of a complete meal break by having to

27  walk to a designated area some distance away for every meal break. Liability regarding this claim

28  hinges on the amount of time, if any, that employees took to walk to the location they would take their

meal break. There is conflicting evidence on where the employees chose to take their lunch and how much time it would take to walk to those areas; the amount of time it would take an employee to walk to the vines near them that have already been harvested to take his or her lunch would presumably be much less than walking to the edge of the rows or the shade trailers.

Consequently, there are important individualized questions with respect to the meal break claim, namely, where employees chose to take their meal break, whether it was an appropriate distance away from the vines they were working on harvesting or a greater distance away. Considering that employees were permitted to take meal breaks where they chose, and without evidence demonstrating that every employee was required to walk to a specific area for every meal period, Plaintiffs have not demonstrated that employees were uniformly subject to walking to break areas that cut into the 30-minute meal period. The evidence does not provide more information on how many workers actually chose to take their meals at locations nearer to where they were working, or even if these locations were adequate for a meal break, nonetheless, the workers were permitted to, which presents conflicting evidence regarding the amount of time that would be required to reach a chosen area for the meal break. Because these are individualized questions, the same generalized, class-wide proof — for example, Defendants' policies for providing meal breaks — will fail to make a prima facie showing that Defendants did not provide 30-minute meal breaks to each member of the overarching class. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) (quoting *Newberg on Class Actions* § 4:50 (5th ed. 2012)) ("[A] common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.' "). Instead, resolving these individualized questions will require determining, for example, which particular employees took meal breaks at or near the vines they were working on, and which employees walked for one to five minutes to a different area of the fields for their meal break.

The foregoing individualized questions are at the heart of Plaintiffs' meal break claim, and this is because liability hinges on the length of the meal breaks provided—i.e., how much time of the meal break was spent walking to the worker's chosen meal break area. Consequently, the individualized questions predominate over any common questions at play. Accordingly, class certification under Rule 23(b)(3) is not warranted and will be denied as to Plaintiffs' meal break claim.

1            *iv.*        *Rest Break Violations*

2          Section 226.7 of the California Labor Code together with IWC Wage Order No. 14-2001

3  ("Wage Order No. 14"), which is codified at 8 Cal. Code Regs. § 11140, govern rest breaks for non-

4  exempt agricultural employees. Section 226.7 requires employers to provide rest breaks consistent

5  with the applicable wage order. Wage Order No. 14 requires employers of agricultural workers to

6  provide rest breaks in the following way: one ten-minute rest break is required for shifts between three

7  and one-half hours and six hours in length; two ten-minute rest breaks are required for shifts between

8  six hours and ten hours in length; and three ten-minute rest breaks are required for shifts between ten

9  hours and fourteen hours in length. 8 Cal. Code Regs. § 11140(12); *see also Alberts v. Aurora*

10  *Behavioral Health Care*, 241 Cal. App. 4th 388, 400 (2015) (stating that the employer is liable for

11  violating the wage order if the employer fails to "authorize and permit the amount of rest break time

12  called for under the wage order for its industry") (citing *Brinker Rest. Corp. v. San Diego Cty.*

13  *Superior Court*, 53 Cal. 4th 1004, 1033 (2012)).

14          Although employers are required to "authorize and permit" rest breaks, employees are not

15  required to take provided rest breaks and employers are not required to force employees to take

16  provided rest breaks. 8 Cal. Code Regs. § 11140(12); *Brinker Rest. Corp. v. Superior Court*, 53 Cal.

17  4th 1004, 1033 (2012). Additionally, employers are not required to track or record rest breaks. 8 Cal.

18  Code Regs. § 11140(7)(A)(3); *see also Munoz v. Giumarra Vineyards Corp.*, Case No. 09-cv-0703,

19  2015 WL 5350563, at *6 (E.D. Cal. Sept. 11, 2015). However, not recording a rest break may create a

20  rebuttable presumption that the employee was not relieved of duty and that no rest break was

21  provided. *See Brinker*, 53 Cal. 4th at 1053 (Werdegar, J., concurring).

22          Plaintiffs claim that like meal periods, Defendants admit to a policy where rest breaks last less

23  than net 10 minutes because the time spent walking to a suitable break area is counted as part of the

24  break. (Doc. 66-1 at 39.) According to Defendants, the Plaintiffs contend that rest breaks were exactly

25  ten minutes but claim that they should have had additional time to walk to a "suitable" area. (Doc. 70

26  at 34.) Defendants also claim that the evidence shows that workers could take breaks wherever they

27  found suitable, including in the rows. (Id.)

28          Sycamore Labor's stated break policy is to provide field workers with a break or lunch for

31

every 2 hours of work, and the only written expression of that policy is a Wage Order 14 document included in the foremen binders to inform field workers of their rights regarding breaks. (Doc. 67, Trabucco Decl. ¶ 48; Doc. 67-19, Loeffel Depo. at 180:1-7, 184:3-15; Doc. 67-21, Rodriguez Depo. at 215:17-218:11.) Sycamore Labor says it provides two 10-minute rest breaks for shifts between 6 and 8 hours. (Doc. 67-21, Rodriguez Depo. at 217:15-218:5.) The first rest break is two hours after start and is ten minutes long. (Doc. 70-2, Defendants' Exh. B, Leoffel Depo. 83:3-9; Doc. 70-2, Defendants' Exh. D, Rodriquez Depo. 130:8-14; Doc. 70-2, Defendants' Exh. G, Moreno Depo. 76:14-23; Doc. 70-2, Defendants' Exh. K, Aceves Depo. 66:11-12.) Foremen call out the break time (Defendants' Exh. F, Alvidrez Depo. 92:16-22) or pass the word from worker to worker that a break is coming up (Defendants' Exh. D, Rodriguez Depo. 138:15-139:24).

Employees can take their break wherever they want, including in the rows. (Defendants' Exh. B, Loeffel Depo. 187:12-18; Defendants' Exh. K, Aceves Depo. 74:17-24). Ms. Martinez-Sanchez testified that "there were people who would rest in the rows." (Defendants' Exh. I, Martinez-Sanchez Depo. at 41:4-7.) All production is stopped during rest breaks. (Defendants' Exh. F, Alvidrez Depo. 92:8-17.) Foremen are responsible for ensuring the breaks are the correct length and that employees are not working during breaks. (Defendants' Exh. H, Eddy Depo. 61:1-14.) They are also responsible for ensuring employees take additional breaks if they are feeling overheated. (Defendants' Exh. K, Aceves Depo. 69:13-70:3.) No employee has ever reported missing a break. (Defendants' Exh. F, Alvidrez Depo. 112:4-113:3.) Employees are given a second 10-minute rest break two hours after lunch. (Defendants' Exh. B, Loeffel Depo. 89:5-19, 180:1-4; Defendants' Exh. D, Rodriguez Depo. 130:22-25; Defendants' Exh. G, Moreno Depo. 77:13-20.) This break is announced like the first break. (Defendants' Exh. H, Eddy Depo. 60:17-25.)

For the same reasons that Plaintiffs' meal break claim lacks sufficient commonality and predominance, so too does the rest break claim. The evidence shows that the employees were provided with net 10-minute rest breaks during their shifts and permitted to take the break wherever they want. In other words, contrary to Plaintiffs' suggestion, the evidence does not show that Defendant had a universal policy or practice of not authorizing or not providing net 10-minute rest breaks for the entire class. Rather, to the extent that an employee was not provided with or permitted to take a full 10-

32

1  minute rest break, such appears to be the result of the employee's own choices on how and where to

2  utilize his or her rest break.

3         Consequently, insofar as the rest break claim is premised on the theory that Defendants did not

4  provide its employees with full 10-minute rest breaks because the time spent walking to a suitable

5  break area is counted as part of the break (see Doc. 66-1 at 39), there are important individualized

6  questions, namely regarding whether employees chose to take their breaks in the rows, thus not

7  requiring additional time for walking to a different break area. Because these are individualized

8  questions, the same generalized, class-wide proof will fail to make a prima facie showing that

9  Defendants did not provide adequate rest breaks to each member of the overarching class. Instead,

10  resolving these individualized questions will require determining, for example, which particular

11  employees chose to walk to a different area for his or her rest break, how much time that required, and

12  how often this was done for a rest break. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442

13  (2016) (quoting *Newberg on Class Actions* § 4:50 (5th ed. 2012)) ("An individual question is one

14  where 'members of a proposed class will need to present evidence that varies from member to

15  member.'"); *see, e.g.*, *Cortez v. Best Buy Stores, LP*, Case No. 11-cv-5053, 2012 WL 255345, at *4

16  (C.D. Cal. Jan. 25, 2012) (stating that where the failure to provide rest breaks was not universal to the

17  entire class, and where there are not time records of employees taking rest breaks, "[t]he only apparent

18  way to determine if an employee was denied a rest period (and to determine how many rest periods

19  that employee was denied) would be to make an individualized inquiry of each hourly employee.").

20         The foregoing individualized questions are at the heart of Plaintiffs' rest break claim, and this

21  is because liability hinges on whether the employees were required to walk to a suitable break area and

22  whether this walking time was considered part of the break. Notably, the evidence demonstrates that

23  employees were permitted to take breaks wherever they found suitable, and some took their break in

24  the rows, which would not require time to walk to another suitable break area. Defendants provided

25  and paid its employees for rest breaks. Consequently, the individualized questions predominate over

26  any common questions at play. Accordingly, class certification under Rule 23(b)(3) is not warranted

27  and will be denied as to Plaintiffs' rest break claim.

28  ///

v.      *Separate Pay for Rest Breaks for Shifts Between 6 and 8 Hours*

California law requires piece rate work be separately compensated for rest breaks at an amount not less than the minimum wage. Lab. Code § 226.2. Plaintiffs claim that at points during the class period, Defendants failed to provide a second rest break for class members whose shifts lasted less than 8 hours but more than 6 hours during the harvest. (Doc. 66-1 at 40.) According to Plaintiffs, proof of this policy and damages is available in Defendants' payroll database, which shows length of shifts and whether a second rest break has been paid when the shift is less than 8 hours but more than 6 hours. (Id.) However, Plaintiffs' certification motion fails to meaningfully address this claim or provide sufficient evidentiary support. Significantly, though Plaintiffs' claim refers to the entirety of the class members, Plaintiffs fail to provide evidence regarding such a policy that applied to the class members. The certification motion includes payroll information for the named defendants, Eugenio Antonio Cruz and Sebastiana Martinez-Sanchez, for a one-week period (from July 30, 2018 to August 4, 2018); in these two pay stubs, there is one day, July 31, 2018, in which the two named plaintiffs worked 6.5 hours and were paid only for one rest break. (Doc. 67-29, Plaintiffs' Exh. 33; Doc. 67-30, Plaintiffs' Exh. 34.) Defendants assert that Plaintiffs offer no evidence regarding the number of breaks they took this day, or why they took the number of breaks they did. (Doc. 70 at 34.) As Defendants contend, even assuming that a per-se violation of California law has occurred, Plaintiffs make no showing that this happened to any other member of the putative class, or that this was anything other than an isolated incident. (Doc. 70 at 34.) To the contrary, Ramiro Rodriguez, Sycamore Labor's President, testified that two rest breaks are provided for a shift that is six to eight hours long. (Doc. 67-21, Rodriquez Depo. at 217:15-218:1.) Accordingly, with evidence of only one occurrence, Plaintiffs have not shown that common questions predominate on this issue and class certification must be denied.

vi.      *Failure to Reimburse for Tools and Equipment*

California Labor Code section 2802 provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Lab. Code § 2802.

Plaintiffs assert that during the harvest, workers require shears and other equipment to pick

34

grapes. (Doc. 66-1 at 40.) Plaintiffs allege that the Defendants admit that workers need shears and that these shears have a limited life span and may not last an entire harvest season. (Id.) According to Defendants, Plaintiffs have not established how the court can determine which workers bought clippers or whether those purchases were necessary. (Doc. 70 at 35.) Defendants assert that they have established that they provide employees with all necessary equipment to do their job, and that each foreman keeps extra clippers in his or her trailer. (Id.)

Sycamore Labor provides all the tools and equipment employees need to perform their duties. (Doc. 70-2, Loeffel Depo. at 232:1-7; Rodriguez Decl. at ¶ 15.) This includes loppers, gloves, eye protection, and clippers. (Loeffel Depo. at 231:1-17; Rodriquez Depo. at 123:18-22.) Sycamore Labor maintains that a pair of harvesting clippers, while prone to break and become unusable, is made available to anyone who needs them, and class members are supposed to be able to request replacements. (Doc. 67-21, Rodriquez Depo. at 244:18-245:11.) Each foreman keeps extra clippers in his or her trailer because, during harvest, employees cannot work without clippers. (Loeffel Depo. 231:10-21; Rodriguez Depo. 123:23-124:10.) There is no cap on the number of replacements. (Loeffel Depo. 231:22-25; Rodriguez Depo. 124:3-10.) Sycamore orders additional clippers before they are needed. (Moreno Depo. at 101:13-102:2.) Invoices to garden supply stores indicate that Sycamore Labor purchased 708 harvesting shears in 2017 (Doc. 67-33, Plaintiffs' Exh. 37, at 2-4), 2,480 harvesting clippers in 2018 (id. at 5-6), 2,304 harvesting clippers in 2019 (id. at 7-9), and 1,728 harvesting clippers in 2020 (id. at 10-12). Defendants admit they are not aware of reimbursing a field worker for a business expense. (Doc. 67-19, Loeffel Depo. at 206:20-207:4; Doc. 67-21, Rodriguez Depo. at 238:15-25.)

Plaintiffs report that evidence of Defendants' failure to provide class members with tools or reimburse them for tool purchases is found in Defendants' own records and testimonial admissions. (Doc. 66-1 at 40.) Sebastiana Martinez-Sanchez testified that Defendants provided her and her husband with clippers, but they did not last long, and she and her husband bought replacement clippers but does not have receipts for the purchases. (Doc. 67-27, Martinez-Sanchez Depo. 34:12-36:8.) She also testified that they had to purchase gloves to do their work. (Martinez-Sanchez Depo. 36:9-38:3.) Eugenio Antonio-Cruz testified that he had to purchase shears and gloves also because Defendants

1   only give them one and that does not last through harvest. (Doc. 67-28, Antonio-Cruz Depo. 57:2-21.)

2         The evidence demonstrates that harvest fieldworkers require equipment such as clippers and

3   gloves during the harvest season for their work but does not clearly establish whether Defendants

4   provided equipment in the necessary quantities. Though Plaintiffs allege that Defendants failed to

5   purchase a sufficient quantity of clippers required for fieldworks (Doc. 71 at 26) and the named

6   plaintiffs testified that they bought clippers and gloves themselves (Martinez-Sanchez Depo. 34:12-

7   38:3; Antonio-Cruz Depo. 57:2-21), Defendants assert that they provide employees with all necessary

8   equipment to do their job (Doc. 70 at 35; Doc. 70-2 at 65, Rodriquez Decl. ¶15.) The evidence also

9   demonstrates that workers had access to replacement equipment that was kept by each foreman.

10   (Loeffel Depo. 231:10-21; Rodriguez Depo. 123:23-124:10.)

11         The evidence is also unclear as to whether every member of the crew was required to purchase

12   additional equipment, in addition to what was provided by Sycamore Labor. For example, the

13   evidence suggests that the shears purchased by Sycamore Labor were of poor quality and would not

14   cut the vines after some use, suggesting that each member of the crew would have to purchase shears

15   (considering that shears were required to do the field work). However, the evidence falls short of

16   demonstrating that every member of the crew incurred expenses of his or her own. Instead, it

17   demonstrates that shears were provided and replacements were available, and at least some workers

18   (*i.e.*, the named plaintiffs) chose to purchase shears of their own. Martinez-Sanchez clarified in her

19   testimony that she was describing how many shears her and her husband would buy, and not the

20   entirety of their crew. (See Doc. 67-27, Martinez-Sanchez Depo. at 35:3-22.)

21         Additionally, as Defendants allege, Plaintiffs have not established which workers bought

22   clippers or whether those purchases were necessary. (Doc. 70 at 35.) *See* Opp'n at 24 (citing *Grissom*

23   *v. Vons Co.,* 1 Cal.App. 4th 52, 58 (1991) ("Necessity is by nature a question of fact . . . accordingly,

24   ascertaining what was a necessary expenditure will require an inquiry into what was reasonable under

25   the circumstances"); *see also Morgan v. Wet Seal, Inc.,* 210 Cal.App. 4th 1341, 1357 (2012) (noting

26   that because the employer's written policy did not require the employee to purchase Wet Seal clothing

27   as a condition of employment, "individualized inquiries would be necessary in order to determine

28   whether any given purchase by an employee constituted a 'necessary expenditure' within the meaning

1    of section 2802").

2            Ultimately, individual issues predominate over issues common to this tools and equipment

3    issue. *See Dilts v. Penske Logistics, LLC,* No. 08-318, 2014 WL 866954, at *7 (S.D.Cal. Feb. 19,

4    2014) (decertifying a tools class after finding that the "determination of whether class members were

5    wrongfully required to buy tools . . . involves too many individualized questions for class-wide

6    resolution. For instance, who purchased tools, did they inform Penske, and did they

7    seek reimbursement? Were the tools the employees bought to supplement tools provided by Penske in

8    fact *necessary* ?"); *see also Chavez v. Lumber Liquidators,* No. 09–4812, 2012 WL 1004850, at *10

9    (N.D.Cal. Mar. 26, 2012) ("[T]o assess the merits of Plaintiffs' reimbursement claim, the Court would

10   need to scrutinize each class member's claimed expenses. Specifically, the Court would need to make

11   individualized factual determinations concerning: (1) whether the claimed expenses were 'necessary'

12   and incurred in direct consequence of the discharge of the employee's duties; (2) whether the

13   employee actually sought reimbursement from LLI for the expenses; and (3) whether LLI reimbursed

14   the employee for the expense."); *Harris v. Vector Marketing Corp.,* 753 F.Supp.2d 996, 1022

15   (N.D.Cal.2010) (denying class certification where plaintiff failed to demonstrate "that evaluation

16   under § 2802 of the 'necessity' of various expenses incurred in a variety of contexts may be done on a

17   relatively uniform basis" and "[d]etermining the necessity of the variety of expenses incurred by

18   [employees] appears to involve qualitative as well as quantitative analysis, not a 'straightforward

19   calculation' ") (citing *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas*

20   *Sands, Inc.,* 244 F.3d 1152, 1163 (9th Cir. 2001)).

21           Because Defendants' policies permitted, but did not require, employees to use their own tools

22   at work, Plaintiffs fail to demonstrate how they can establish class-wide liability under Section 2802

23   when the evidence shows that putative class members used the tools provided by Defendants and/or

24   brought their own tools for a variety of reasons. Although class representatives testified to purchasing

25   their own equipment, Plaintiffs have not provided a class-wide method of determining whether various

26   tools purchased by employees were necessary under Section 2802. *See Howard v. Gap,* No. 06–6773,

27   2009 WL 3571984, at *5 (N.D.Cal. Oct. 29, 2009) (denying class certification for a section 2802 claim

28   for lack of predominance and explaining that "[i]t is not enough for the class representative to testify

as to his or her story. There must be a common method of proof that tends to establish the required elements of liability as to all class members.").

As there is no written policy requiring employees to purchase necessary tools, Plaintiffs fail to demonstrate that Defendants operate under a general practice of requiring employees to provide their own tools without reimbursement as a class-wide basis for liability. There is no commonality as there would necessarily be individualized inquiries into whether the employee was sufficiently provided equipment necessary to do their job or if they had to supplement what was provided by the employer with their own individual purchases. Therefore, given the conflicting evidence regarding whether employees needed to purchase their own equipment and the necessity for individualized inquiries, Plaintiffs fail to establish predominance, and the Court denies class certification as to the tools and equipment issue.

> vii.   *Failure to Timely Pay All Wages Owed Each Season or at Termination*

Plaintiffs assert that Defendants allegedly failed to pay pre- and post-shift work, violated the minimum wage by auto-deducting 30 minutes of pay for meal periods lasting less than that time, failed to pay separately for rest periods in violation of Labor Code section 226.2, and failed to pay sick leave at the required wage rate. (Doc. 66-1 at 41.) Plaintiffs allege that the waiting time claim is derivative of the underlying wage claims. (Id.)

Labor Code sections 201 and 202 require employers to pay all wages owed timely (72 hours for resignation and immediately for involuntary termination) upon separation from employment. Failure to pay all wages timely subjects employers to waiting time penalties under Labor Code section 203.

Plaintiffs' certification motion fails to meaningfully address the waiting time claim, including addressing whether the claim satisfies Rule 23(b)(3)'s commonality and predominance requirements. At most, the certification motion merely asserts that Plaintiffs' "waiting time claim is derivative of the underlying wage claims," and "[i]f the Court grants certification on Plaintiffs' minimum wage claim, Plaintiffs' derivative waiting time penalty claim should also be certified." (Doc. 66-1 at 41; Doc. 71 at 27.)

Because Plaintiffs take the position that their waiting time claim is purely derivative, and

because Plaintiffs did not even attempt to demonstrate that the waiting time claim independently

warrants certification under Rule 23(b)(3), the Court will not independently consider this claim for

certification under Rule 23(b)(3). *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Wal-Mart*

*Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (stating that party seeking class certification bears the

burden of establishing conformity with Rule 23's requirements, and must do so by producing facts

"affirmatively demonstrat[ing]" that certification is warranted.). Moreover, even if the Court wanted to

carry Plaintiffs' burden and investigate for itself whether certification under Rule 23(b)(3) is

warranted, the Court would be in poor position to do so. This is because Plaintiffs failed to explain the

specific legal and factual basis for their waiting time claim.[2]

Plaintiffs' certification motion only references Labor Code sections 201 and 202 and vaguely

asserts that "[t]he waiting time claim is derivative of the underlying wage claims, and the driving

question with regard to this claim is whether the failure to pay any of the above wages was willful."

(Doc. 66-1 at 41.) With only these meager assertions on the table, the Court cannot adequately

consider the commonality and predominance requirements of Plaintiffs' waiting time

claim. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (stating that Rule 23 requires more than

"a mere pleading standard"); *Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 321 (C.D. Cal.

2015) ("More than a pleading standard, Rule 23 requires the party seeking class certification to

affirmatively demonstrate compliance with the rule[.]") (citations omitted). Accordingly, class

certification under Rule 23(b)(3) is not warranted and will be denied as to Plaintiffs' waiting time

claim.

### viii.    Failure to Issue Accurate Wage Statements

Labor Code section 226(a) provides in pertinent part:

(a) An employer, semimonthly or at the time of each payment of wages, shall furnish to
his or her employee, either as a detachable part of the check, draft, or voucher paying the
employee's wages, or separately if wages are paid by personal check or cash, an accurate
itemized statement in writing showing (1) gross wages earned, (2) total hours worked by

---

[2] Plaintiffs' first amended complaint also does not offer sufficient allegations as to the waiting time claim (see Doc. 6 at ¶¶ 149-157), offering "little more than a paraphrase of the statute and [are] thus too meager, vague, or conclusory to nudge plaintiffs' claim from the realm of mere conjecture to the realm of plausibility." *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 642 (9th Cir. 2014), *as amended* (Jan. 26, 2015) (quoting *Pruell v. Caritas Christi*, 678 F.3d 10, 13 (1st Cir. 2012) (discussing overtime claim allegations)).

the employee, except as provided in subdivision (j), (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as defined in subdivision (b) of Section 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee . . .

Cal. Lab. Code § 226(a). For employees who are compensated on a piece-rate basis, the itemized wage statement must also "separately state the following . . . : (A) The total hours of compensable rest and recovery periods, the rate of compensation, and the gross wages paid for those periods during the pay period" and "the total hours of other nonproductive time . . . , the rate of compensation, and the gross wages paid for that time during the pay period." Cal. Lab. Code § 226.2(a)(2).

Plaintiffs assert that Defendants' wage statements fail to state accurately gross and net wages owed because of the alleged failure to pay for all hours worked, premium rest and meal period wages, and sick leave, and fail to state accurately total hours worked and all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate. (Doc. 66-1 at 41.) Plaintiffs further allege that as to hourly plus piece rate pay, the statements during a portion of the class period inaccurately stated the separate pay for rest periods and nonproductive time and the proper rate at which rest periods and nonproductive time were to be paid. (Id.) Plaintiffs assert that the wage statement claim derives from the other claims that Plaintiffs seek to certify and for which common issues predominate. (Id.)

However, similar to the claim regarding the failure to timely pay all wages owed, Plaintiffs' certification motion fails to meaningfully address this claim, including addressing whether the claim satisfies Rule 23(b)(3)'s commonality and predominance requirements. Again, because Plaintiffs take the position that their wage statement claim is purely derivative, and because Plaintiffs did not even attempt to demonstrate that the wage statement claim independently warrants certification under Rule 23(b)(3), the Court will not independently consider this claim for certification under Rule 23(b)(3). *See Comcast Corp.*, 569 U.S. at 33 (2013); *Wal-Mart Stores, Inc.*, 564 U.S. at 350.

40

1    Accordingly, class certification under Rule 23(b)(3) is not warranted and will be denied as to

2    Plaintiffs' wage statement claim.

3                   ix.    *Sick Leave Pay*

4           Plaintiffs report that Defendants' payroll records show that sick leave is paid at the minimum

5    wage or a rate that is below the regular rate or average rate in the prior 90-day period. (Doc. 66-1 at

6    42.) Plaintiffs allege that this claim is subject to common proof in the form of Defendants' sick pay

7    practices and payroll records showing improper payment of sick leave. (Id.)

8           According to Defendants, Plaintiffs' operative complaint alleges that Defendants' wage

9    statements inaccurately accrued paid sick leave days, but contains no claim that Defendants paid sick

10   leave at an improper hourly rate. (Doc. 70 at 36, citing Doc. 6 (First Amended Complaint) at ¶ 70.)

11   Defendants contend that because the "Paid Sick Leave Class" is based upon a claim not pled in the

12   operative complaint, the Court should deny certification of that class. (Doc. 70 at 36.)

13          In their reply, Plaintiffs state that "Plaintiffs will not be pursuing this claim on a class-wide

14   basis" (Doc. 71 at 28), accordingly, the Court need not address this issue for class certification

15   purposes.

16                  x.    *Violation of the Unfair Competition Law*

17          California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent

18   business act or practice." Cal. Bus. & Prof. Code § 17200. The scope of the UCL's "coverage is

19   sweeping, embracing anything that can properly be called a business practice and that at the same time

20   is forbidden by law." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180

21   (1999) (citations omitted). In prohibiting "any unlawful" business practice, UCL "borrows violations

22   of other laws and treats them as unlawful practices that the unfair competition law makes

23   independently actionable." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1129-30 (9th Cir. 2014) (citations

24   omitted).

25          Plaintiffs claim that common issues predominate as to the UCL claim restitution of wages and

26   other equitable relief. (Doc. 66-1 at 42-43.) Plaintiffs allege that Defendants engaged in unlawful

27   practices which constitute unfair competition under Business and Professions Code section 17200,

28   including the following: (a) failure to compensate pre- and post-shift work, (b) the unlawful deduction

41

1   of 30 minutes for meal periods where less than 30 minutes off-duty were provided, (c) failure to pay

2   meal period premiums where the Defendants failed to provide 30 minutes of time off duty, (d) failure

3   to pay rest period premiums where Defendants failed to provide net-10 minutes of rest, (e) failure to

4   provide paid rest periods at the rates required by Labor Code section 226.2 and failure to pay rest

5   period premiums for such failure, and (f) failure to provide sick leave pay at the rate required under

6   Labor Code section 246(g). (Doc. 66-1 at 43.)

7        In relation to this claim, Plaintiffs seek an injunction restraining Defendants from maintaining

8   and enforcing the unfair and/or unlawful practices and policies that have resulted in the alleged

9   violations (Doc. 6 at 29-31, First Amended Complaint ¶¶ 158-166), however, as discussed further

10  below, Plaintiffs indicated that they have not been able to locate a class member currently employed

11  by Defendants who is willing to serve as a class representative for an injunctive relief subclass.

12  Accordingly, the Court need not address this claim for purposes of this order.

13        *b.    Ascertainable*

14        A class is sufficiently defined and ascertainable if it is "administratively feasible for the court

15  to determine whether a particular individual is a member." *O'Connor,* 184 F.R.D. at

16  319; accord *Davoll v. Webb,* 160 F.R.D. 142, 143 (D.Colo.1995); *see also Buford v. H & R Block*, 168

17  F.R.D. 340, 347 (S.D. Ga. 1996) ("[T]he 'description of the class must be sufficiently definite to

18  enable the court to determine if a particular individual is a member of the proposed class,' "

19  quoting *Pottinger v. Miami,* 720 F.Supp. 955, 957 (S.D.Fla.1989)).

20        Plaintiffs claim that the class members are readily ascertainable here by reference to objective

21  criteria. (Doc. 66-1 at 43.) Plaintiffs allege that the class consists of all fieldworkers who worked in

22  Defendants' grapes operations in California. (Doc. 66-1 at 44.) Plaintiffs claim that Defendants'

23  employee lists and payroll records (which have already been produced), provide objective criteria for

24  identifying class members. (Id.) Defendants contend that all of Plaintiffs' class definitions suffer the

25  same problem: they include people who suffer no harm. (Doc. 70 at 36.) According to Defendants,

26  someone who worked during non-harvest seasons, or who worked for a "nice" foreman, or who

27  always showed up right on time, or who took all his breaks in the field would, under Plaintiffs'

28  theories, have not been injured. (Id.)

1   Plaintiffs are not required to precisely identify every potential member of the class to meet the

2   standard for ascertainability. Plaintiffs need only proffer objective criteria that makes identification of

3   the class administratively feasible. *See Bee, Denning, Inc. v. Cap. All. Grp.*, 310 F.R.D. 614, 623 (S.D.

4   Cal. 2015). Plaintiffs have identified the employee lists and payroll records that have already been

5   produced as such objective criteria, providing a straightforward means of determining membership in

6   the putative class. Defendants' argument that the class definitions include people who suffer no harm

7   is addressed by the Court's foregoing analysis in determining which issues are appropriate for

8   certification. Membership in the putative class is not ambiguous or speculative but depends solely on

9   being employed by Sycamore Labor during the class period. Thus, "all the parameters for membership

10  in this class are objective criteria, and defendants' business records should be sufficient to determine

11  the class membership status of any given individual." *Hofstetter v. Chase Home Finance, LLC,* No. C

12  10–01313, 2011 WL 1225900, *14 (N.D.Cal. Mar. 31, 2011) (finding that the ascertainability

13  requirement was satisfied); *see also Gardner v. Shell Oil Co.,* No. C 09–05876, 2011 WL 1522377, *4

14  (N.D.Cal. Apr. 21, 2011) ("Defendants do not dispute that members of the proposed class can be

15  identified from their timekeeping and payroll records. Accordingly, the Court finds that the class

16  definitions are sufficiently particular and ascertainable"); *Misra v. Decision One Mortg. Co.,* No. SA

17  CV 07–0994 DOC (RCx), 2009 WL 4581276, *4 (C.D.Cal. Apr. 13, 2009) ("[T]his Class

18  is ascertainable because the Class members were employed by Decision One and can be determined

19  from employment records"). The Court therefore concludes that the class is ascertainable.

20      *c.      Superiority*

21      Plaintiffs assert that class members have little interest in individually controlling separate

22  actions as many of them still are employed by a subcontractor cleaning Ross stores, and the concern

23  for possible employer reprisal exists if they institute their own lawsuits. (Doc. 66-1 at 44, citing Fed.

24  R. Civ. P. 23(b)(3)(A).) Additionally, Plaintiffs assert that class member's individual monetary

25  damages are likely to be small, given that the farmworkers were working seasonally and earned

26  minimum wage or slightly above the minimum wage. (Doc. 66-1 at 44.) Furthermore, Plaintiffs

27  contend that a class action is superior because it is manageable, alleging that the common question in

28  this case predominates over any individual questions. (Id.)

Defendants claim that Plaintiffs have made no showing that their proposed class action would be manageable. (Doc. 70 at 37.) According to Defendants, Plaintiffs simply ignore the practical problems that trying their theories would engender: The Court would have to individually examine, for thousands of workers, what disclosures were made, how early they arrived at work, why they arrived when they did, whether Defendants exerted sufficient control over the worker to be compensable time, the length of each break, where it occurred, and what time the worker actually stopped working. (Id.)

The superiority inquiry requires a determination of "whether objectives of the particular class action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted). This tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Pursuant to Rule 23(b)(3), the Court should consider four non-exclusive factors to determine whether a class is a superior method of adjudication, including (1) the class members' interest in individual litigation, (2) other pending litigation, (3) the desirability of concentrating the litigation in one forum, and (4) difficulties with the management of the class action.

### i.    Class members' interest in individual litigation

Plaintiffs allege that class members have little interest in individually controlling separate actions as many of them still are employed by a subcontractor cleaning Ross stores, and the concern for possible employer reprisal exists if they institute their own lawsuits. (Doc. 66-1 at 44, citing Fed. R. Civ. P. 23(b)(3)(A).) Additionally, Plaintiffs assert that class member's individual monetary damages are likely to be small, given that the farmworkers were working seasonally and earned minimum wage or slightly above the minimum wage. (Doc. 66-1 at 44.) Plaintiffs contend that the modest damages at issue do not justify the cost of individual litigation. (Id.) Further, Plaintiffs contend that a class action is superior because it is manageable, alleging that the common questions in this case predominates over any individual questions. (Id.) Accordingly, there is no evidence the putative class members would have an interest in individually pursuing or controlling their own cases. Therefore, this factor weighs in favor of class certification.

### ii.    Other pending litigation

The parties have not identified any other litigation regarding the claims presented, by or

against class members. Accordingly, this factor does not weigh against class certification.

> ### iii.    Desirability of concentrating litigation in one forum

Because common issues predominate on Plaintiffs' class issues, "presentation of the evidence in one consolidated action will reduce unnecessarily duplicative litigation and promote judicial economy." *Galvan v. KDI Distrib.*, 2011 U.S. Dist. LEXIS 127602, at \*37 (C.D. Cal. Oct. 25, 2011). Moreover, because putative class members were employed within the Eastern District, their claims arose within the same forum. Thus, class-wide determination in one forum appears desirable.

> ### iv.    Difficulties in managing a class action

Because any individualized issues for the monetary relief class issues relate only to damages, this does not weigh against management of a class action. Conducting this matter as a class action would be less burdensome than numerous separate actions, which could involve duplicative discovery and repeated adjudication of the same legal issues. Based upon the evidence before the Court, any difficulties in managing the class action appear to be outweighed by the other factors.

### C.    Rule 23(c)(4) Requirements

Under Rule 23(c)(4), "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). As such, "[e]ven if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23[(c)(4)] authorizes the district court in appropriate cases to isolate the common issues . . . and proceed with class treatment of these particular issues." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). However, "a Rule 23(c)(4) issues class must still meet the requirements of Rule 23(a) and (b) (except for the predominance requirement of Rule 23(b)(3))." *Tasion Communications, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal. 2015).

Plaintiffs assert that Rule 23(c)(4)(A) permits a class to be certified for specific issues or elements of claims raised in the litigation. (Doc. 66-1 at 44.) Plaintiffs claim that its class-wide liability claims may be appropriately certified under Rule 23(c)(4). (Doc. 66-1 at 45.) Defendants argue that Plaintiffs have failed to establish the requirements of FRCP 23(a) and (b) for any of their sub-issues. (Doc. 70 at 37-38.) Defendants argue that the Court should not grant class certification

1  limited to particular liability issues. (Id. at 38.)

2      Indeed, Rule 23(c)(4) enables a district court to certify an issue class "[w]hen appropriate," but

3  a court does not abuse its discretion when it declines to do so because certifying a class does not

4  "materially advance[] the disposition of the litigation as a whole." William B. Rubenstein, 2 Newberg

5  on Class Actions 4:90 (5th ed. 2012); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234

6  (9th Cir. 1996) (finding that the "district court abused its discretion by not adequately considering the

7  predominance requirement before certifying the [issue] class"). Plaintiffs failed to show that Rule

8  23(c)(4) certification was "appropriate," and as set out above, the Court considered the predominance

9  requirement regarding each issue in the foregoing analysis.

10      **D.    Article III Standing – Injunctive and Declaratory Relief Class**

11      Prior to evaluating Plaintiffs' proposed classes under Rule 23, the Court must determine

12  whether Plaintiffs have standing to assert their claims.  As the Ninth Circuit explained, standing "is a

13  jurisdictional element that must be satisfied prior to class certification. *LaDuke v. Nelson*, 762 F.2d

14  1318, 1325 (9th Cir. 1985).  Consequently, the Court should address the issue of standing prior to

15  certifying a class. *See Easter v. Am. West Fin.*, 381 F.3d 948, 962 (9th Cir. 2004).

16      "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold

17  requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City

18  of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).  The Ninth Circuit explained, "[T]he Constitution

19  mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that

20  the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Thomas v. Anchorage

21  Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (quoting *Ry. Mail Assoc. v. Corsi*, 326

22  U.S. 88, 93 (1945)).  To satisfy the "case or controversy" requirement, a plaintiff must establish

23  standing under Article III to bring suit.  *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1000

24  (9th Cir. 2010); *see also Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 938 (2007)

25  ("standing is an essential and unchanging part of the case-or-controversy requirement of Article III").

26      To establish standing—and thus that there is an actual case or controversy—a plaintiff "must

27  demonstrate (1) an injury-in-fact, (2) causation, and (3) a likelihood that the injury will be redressed

28  by a decision in the plaintiff's favor." *Human Life,* 624 F.3d 1000 (citing *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560 (1992)).  In a proposed class action, "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003).

Furthermore, a class must be defined to include only individuals with Article III standing. *See Dukes*, 131 S.Ct. at 2552 (acknowledging "the necessity" to exclude putative class members who "lack[ed] standing to seek injunctive or declaratory relief" from a proposed class).  As such, the Ninth Circuit has determined that "no class may be certified that contains members lacking Article III standing." *Mazza v. Am. Honda Motor*, 666 F.3d 581, 594 (9th Cir. 2012) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)).  Similarly, other circuits have determined class certification was not appropriate when it was not clear that class members had Article III standing for the claims presented.  *See, e.g., Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) (affirming the denial of class certification where it was not clear "the proposed class members have all suffered a constitutional or statutory violation warranting some relief"); *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) ("a class cannot be certified if it contains members who lack standing"). Consequently, the Court must determine whether the class proposed by plaintiff contains only individuals who have standing under Article III.

Based upon the parties' submissions, it is apparent that the named Plaintiffs no longer work for Defendants. In its opposition, Defendants assert that Plaintiffs lack standing to certify a class under Rule 23(b)(2) because Plaintiffs worked for Defendants in 2017, 2018, and 2019, and they both quit in the middle of the 2019 harvest season, shortly before this action was filed. (Doc. 70 at 22.) According to Defendants, when this action was filed, Plaintiffs had voluntarily quit their employment, although work was still available, and thus cannot claim they were "current" employees, or that there is any reasonable basis to believe that they would return to work for Defendants in the future. (Doc. 70 at 22-23.) Accordingly, Defendants argue that they lack Article III standing to pursue an injunction against Defendants. (Doc. 70 at 23.)

In reply, Plaintiffs assert that, given this discrepancy in the timeline of their employment with Defendants, Plaintiffs do not intend to seek to represent a declaratory and injunctive relief class

pursuant to Rule 23(b)(2). (Doc. 71 at 13.) Plaintiffs further assert that federal courts have the authority and discretion to substitute new class representatives to protect the interest of putative class members, even up to the point of class certification. (Doc. 71 at 13.) Plaintiffs contend that courts routinely find the addition of named plaintiffs at this stage of a class action not to be prejudicial, and even routinely permit such amendment at later stages. (Doc. 71 at 13-14, citing *Amparan v. Plaza Home Mortg., Inc.*, 2009 WL 2776486, at *2 (N.D. Cal. Aug. 28, 2009), *Gould v. Motel 6, Inc.*, 2011 WL 759472, at *4 (C.D. Cal. Feb. 22, 2011).)

The Court granted Defendants leave to file a sur-reply only on the issue of allowing a new class representative to be named and provided Plaintiffs an opportunity to file a reply. (Doc. 72.) On August 16, 2021, Defendants filed a sur-reply in which they contest allowing a new class representative to be named, by first distinguishing cases cited by Plaintiffs (Doc. 74 at 3-7) and arguing that Plaintiffs have not made the required showing of good cause to amend the scheduling order or complaint, contending that Plaintiffs' request is untimely and improper (id. at 7-8). Plaintiffs filed a reply to the sur-reply in which Plaintiffs request the Court to exercise its discretion and consider Antonio Martinez as the proposed representative for the declaratory and injunctive relief class and appoint Mr. Martinez as class representative. (Doc. 75 at 8-9.) Alternatively, Plaintiffs requested that the Court exercise its discretion to permit amendment to add Mr. Martinez or another suitable class member as a class representative for the declaratory and injunctive relief class. (Id. at 9.)

Pursuant to the Court's order, Plaintiffs filed a notice of intent to file a motion to amend the complaint to add another class member plaintiff to fill the role of class representative for the declaratory and injunctive relief class. (Doc. 77.) However, subsequently, Plaintiffs filed a statement indicating that Antonio Martinez, who Plaintiffs previously identified to serve as an additional class representative, is no longer an employee of Defendants and last worked for Defendants in January 2020 and is no longer suitable as an injunctive relief class representative. (Doc. 80 at 2.) Plaintiffs further indicated that they have not been able to locate a class member currently employed by Defendants who is willing to serve as a class representative for an injunctive relief subclass. (Doc. 80 at 2.) Because Plaintiffs are not able to identify an individual willing to serve in this capacity, Plaintiffs requested that the Court deny certification of the injunctive relief class without prejudice.

(Doc. 80 at 2.) Since the Plaintiffs lack standing to pursue their claims for injunctive relief and in accordance with Plaintiffs' request, the Court will deny without prejudice Plaintiffs' request to certify any of the subclasses for the purposes of seeking declaratory and injunctive relief.

**IV.     FINDINGS AND RECOMMENDATIONS**

Based upon the foregoing, the Court **RECOMMENDS** Plaintiffs' motion for class certification be **GRANTED IN PART AND DENIED IN PART** as follows:

1.     The request to certify the injunctive and declaratory relief class be **DENIED WITHOUT PREJUDICE**;

2.     The request to certify the monetary relief class be **GRANTED** and defined as

> All persons employed by Defendants as non-exempt fieldworkers in non-supervisory positions who performed agricultural work for Anthony Vineyards' agricultural operations within the State of California at any time between October 4, 2015 through the date of service of this order.

3.     The request to certify the following issues be **GRANTED**:

a.     Whether Defendants' policy of not disclosing in writing the items required under Labor Code section 2810.5 violates AWPA's disclosure and posting requirements or whether the material omission of this information constitutes false and misleading information;

b.     Whether Defendants violated AWPA by providing false and misleading information by not disclosing the following practices: (a) the auto-deduction of 30 minutes for meal periods lasting less than 30 minutes, (b) the payment of sick leave at the minimum wage rate as opposed to the statutory rates described in Labor Code section 246, (c) the denial of net-10 minute rest breaks, (d) the denial of rest break and meal period premiums, (e) the failure to record accurately the start and end of work periods, (f) the policy of not providing tools and not reimbursing for tool expenses, and (g) the failure to record accurately all hours worked.

c.     Whether Defendants failed to compensate for hours worked outside the scheduled shift, in violation of Wage Order 14 and Labor Code sections 204, 510, and 1194.

49

4.      The request to certify the following issues be **DENIED**:

    a.    Whether Defendants' policy of auto-deducting 30 minutes for meal periods violates the meal period and minimum wage laws, in violation of Labor Code sections 226.7 and 512, and Wage Order 14.

    b.    Whether Defendants fail as a matter of policy to provide net-10 minutes of rest and whether this in turn violates the Wage Order and Labor Code section 226.7.

    c.    Whether Defendants violated Labor Code section 226.2 by failing to provide separate pay for a second rest break due for shifts greater than 6 hours and less than 8 hours.

    d.    Whether Defendants violated Labor Code section 2802 and the Wage Order by failing to provide tools or reimburse the expense of purchasing tools.

    e.    Whether Defendants failed to pay all wages owed at the conclusion of each season, or at the time of termination, in violation of Labor Code sections 201, 202, and 203.

    f.    Whether Defendants failed to provide accurate wage statements stating the total number of hours worked, total pay for all hours worked, payment of premium wages, separately compensating for all paid rest breaks and nonproductive time during piece rate work, and proper accrual of paid sick leave and payment of paid sick leave at the regular rate of pay in the workweek or the average rate in the previous 90 days worked.

    g.    Whether Defendants are liable for restitution under the UCL for failing to compensate for all hours worked, failing to pay rest and meal period premiums, and failure to pay sick leave at the regular rate of pay in the workweek or the average rate in the previous 90 days worked as required under Labor Code section 246.

5.      Plaintiffs Sebastiana Martinez-Sanchez and Eugenio Antonio-Cruz be appointed as class representatives; and

6.      Plaintiffs' counsel, Advocates for Worker Rights, LLP, and the Law Offices of Santos Gomez, be appointed as class counsel.

These Findings and Recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty days after being served with these Findings and Recommendations, any party may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be filed and served within fourteen days of the date of service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991); *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   __**November 18, 2021**__         _____ /s/ Jennifer L. Thurston

CHIEF UNITED STATES MAGISTRATE JUDGE